# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-3351

_____

SBC Advanced Solutions, Inc.

*Plaintiff - Appellant*

v.

Communications Workers of America, District 6

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: April 16, 2015
Filed: July 28, 2015

_____

Before BYE and SMITH, Circuit Judges, and SCHILTZ,[1] District Judge.

_____

SMITH, Circuit Judge.

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota, sitting by designation.

SBC Advanced Solutions, Inc. ("Company") appeals the district court's[2] grant of summary judgment affirming an arbitration award in favor of the labor union Communications Workers of America, District 6 ("Union"). The two parties arbitrated a dispute in which the Union requested a pay differential to be awarded to certain of the Company's employees who had performed job functions of higher-paid employees without being compensated accordingly. The Company contends that the arbitrator erred ruling in favor of the Union primarily by failing to follow precedent established in previous arbitrations between the parties regarding the same collective bargaining agreement (CBA). We affirm.

## I. *Background*

In the late 1990s, SBC Communications, Inc. ("SBC") created the Company as a subsidiary to facilitate entry into the high-speed internet market. The Union represented both the Company's and SBC's employees. Additionally, the Company's relationship with its union employees was governed by the same CBA in effect between SBC and the Union. Among other things, the CBA required that there be tiered job classifications with specific work functions. SBC and the Company occasionally renegotiated the CBA with the Union, which included the opportunity to negotiate the compensation for each job classification. Under the CBA, the parties agreed to arbitrate disputes that could not be handled through a formal grievance process and that an arbitrator's disposition would be "final, and the parties agree[d] to be bound and to abide by such decision."

In 1999, the Company opened a call center in Earth City, Missouri, and staffed it with employees who fit under the required job classifications. Among these job classifications were customer service representatives (CSRs) and service representatives (SRs). According to their specific work functions, a CSR "[p]rimarily

---

[2]The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Missouri.

receives, screens, tests, analyzes, and dispatches trouble reports; explains and suggests various services and/or products to customers; [and] performs other generally related functions." SRs, on the other hand, "[h]andle[] the business transactions in connection with customers' accounts, including telephone and correspondence contacts and collection and order work, etc."

In October 2008, the Company chose twenty CSRs for special training to work with a new computer system called Portal. The CSRs were trained to use Portal by an SR, used SR training materials, and then were subsequently moved to a new work location where they worked alongside SRs and took calls out of the same queue. According to the testimony of the CSRs, this new work was different from the work that they had performed prior to October 2008. Their prior worked focused primarily on calls regarding trouble tickets, such as troubleshooting customer problems with existing services. After their Portal training, however, they primarily worked on order-related duties, such as assisting customers order new services.

On November 13, 2008, the Union filed a grievance alleging that the Company violated Article XV, § 7.a. of the CBA, which states the following:

> A qualified employee . . . who is temporarily scheduled or assigned and does work in a position with a higher established maximum rate of pay throughout a period of two (2) or more full tours in a work week, except for the purposes of training, shall receive for each full tour worked in such position a Classification Differential equal to one-fifth (1/5) of the amount of the weekly wage progression increase to which the employee would at the time be entitled if the employee were actually changed to the higher applicable classification at the employee's regular location.

Thus, as the Union contends, the Portal-trained CSRs were performing the job functions of the higher-paid SRs without receiving a pay differential for this higher-paid work. SBC and the Union had previously arbitrated disputes regarding the same

CBA language and the same issue of employees seeking pay differentials for performing the job functions of higher-paid job classifications. As had been in previous arbitrations, the Union bore the burden of showing a § 7 violation by proving that the grieving employees (1) were qualified employees, (2) performed work of a higher classification, (3) were temporarily scheduled or assigned to perform this work, and (4) performed this work for a period of two tours or more each week for which they seek a pay differential. *See U-Verse Facilities Specialists—Temporary Work in a Higher Position*, AAA Case No. 58 300 00025 11 (2012).

Arbitrator William McKee, Ph.D., arbitrated the dispute. With respect to the first element of a § 7 violation, Arbitrator McKee rejected the Company's assertion that the term "qualified" should be interpreted as "test qualified." During the dispute, the Company argued that in order for an employee to be considered "qualified," the employee had to pass the requisite tests to be eligible for promotion to the higher job classification. Instead, Arbitrator McKee found that an employee could be considered "qualified" "if there is evidence that management has made a cognitive selection of certain employees who are capable of performing duties of a higher job classification." In doing so, Arbitrator McKee relied upon a previous arbitration award that he had decided, *In re Senior Report Clerks*, AAA Case No. 70 300 00505 06 (2008), and the *U-Verse* arbitration. Additionally, Arbitrator McKee distinguished another arbitration that he had decided, *Thomas White*, AAA Case No. 70 300 00788 07 (2008), which came to a somewhat different interpretation based on factual and evidentiary distinctions. Arbitrator McKee also considered and rejected the Company's evidence of the parties' intent in the form of a rough transcript from the 1983 negotiation of the CBA. The transcript reveals that a Union representative asked "[i]n section 6a what does 'qualified' mean[?]"[3] A SBC representative replied that "[t]here are certain job requirements that qualify an employee for the job. Example,

---

[3]Since 1983, the language once found in Article XV, § 6.a. was relocated to § 7.a. The actual language of the section has not been substantively changed.

if have typing for stenographer and can't type, not qualified." Another company representative added that it "[m]eans test qualified. Does not change test qualifications for job. If have group of operators and qualified, would be pressed to go to senior." After a few lines of discussing the corresponding CBA provision regarding seniority, however, the transcript states "Union Rejects!" After considering this evidence, Arbitrator McKee stated that "clearly the Union did not agree to change the language of the CBA to reflect [the Company's] interpretation" and that "the parties left the term 'qualified' unchanged when they negotiated [subsequent] contract[s]."

Arbitrator McKee next addressed whether the CSRs were temporarily assigned to perform the work of a higher classification. Similar to the last issue, Arbitrator McKee relied upon the *U-Verse* arbitration and his previous decision in the *Senior Report Clerks* arbitration. Arbitrator McKee interpreted the CBA language to mean that "[a]n assignment of higher-level work is temporary until such time as the Company chooses to change the job description of the lower title to include those duties." Arbitrator McKee recognized that such an interpretation departed from "Arbitrators Heinsz and Fowler[, who] have held otherwise, reasoning that assignments are not 'temporary' once they become a permanent part of an employee's workload." *See Customer Serv. Representatives*, AAA Case No. 71 300 00259 94 (1998) ("Heinsz Award"); *Marketing Assistants Working in Higher Positions*, AAA Case No. 58 300 00028 01 (2003) ("Fowler Award"). Arbitrator McKee "respectfully depart[ed]" from the Heinsz and Fowler Awards because their interpretation would allow the Company to violate the CBA as long as it maintained a violation long enough to deem new work functions as "permanent." Based on contract interpretation principles, Arbitrator McKee rejected this logic because it would empower the Company with "the unilateral ability to render a provision of the contract meaningless."

Next, Arbitrator McKee addressed whether the CSRs indeed performed work of a higher classification. Arbitrator McKee found that "[t]here is no dispute that from October through December 2008 the Grievants were trained to perform the work in question: handling orders for new service and equipment." After comparing the job titles of CSR and SR, Arbitrator McKee agreed with the Union that "the crucial distinction between the two jobs is that CSRs primarily handle maintenance or repair issues, while [SRs] deal with orders for new service and equipment as well as billing issues." Arbitrator McKee relied upon an arbitration decision by Arbitrator Richard Bloch, *Commc'n Workers of America*, AAA Case No. 71 300 0085-88R (1989), to conclude that the CSRs need not show that they performed all of the work of SRs. Instead, CSRs need only prove that they performed work that was "clearly attributable" to SRs.

The Heinsz Award dealt with a similar request for pay differentials by CSRs working for SBC related to their performance of higher-classified job functions of SRs and Communication Technicians (CTs). The Heinsz Award found in favor of the Company by interpreting the same CBA language to require "the Union to show that *only* higher rated classifications performed the functions added to the duties of the [CSRs]." The Union could not carry this burden before Arbitrator Heinsz because the Company submitted evidence that indicated otherwise. Thus, Arbitrator Heinsz found the following:

> While the changes in the work of the [CSRs] entail their performing functions that may be performed by [SRs], a higher rated classification, the same functions may also be performed by Service Order Writers, a lower rated classification. Similarly, the changes in the manner in which a few of the [CSRs] process certain of the customer reports of service problems through interactions with the switch system are functions which may be performed by [CTs], a higher rated classification, but are also functions which may be performed by Line Translation Specialists, a lower rated classification.

Arbitrator McKee did not address this exclusivity requirement in the Heinsz Award—that grievants show that the job functions for which they seek pay differentials are exclusively performed by higher job classifications. Neither did Arbitrator McKee address the relevant testimony of the Company's Labor Relations Director, Lindsay Larson, who testified that the SR job functions for which the CSRs specifically requested a pay differential are not exclusive to the SR classification, but are also performed by lower-classified job titles.

Finally, Arbitrator McKee addressed the last § 7 element regarding whether the CSRs had performed the higher-classified work for two full tours each work week. Based on the testimony presented, Arbitrator McKee concluded that "[a]lthough the testimony on this point was uneven, evidence shows that the Grievants began performing significant amounts of order-related work following their completion of training in late fall 2008. This generally satisfies the requirement that the work be performed 'throughout two or more full tours per work week.'"

Based on the "uneven" testimony, however, Arbitrator McKee found that "[i]t is possible that each of the CSRs did not perform order-related work throughout two or more tours *each* week after their training started. As such, I grant the Union's request for a make-whole remedy and retain jurisdiction to resolve disputes over implementation." (Emphasis added.) Arbitrator McKee then upheld the grievance and clarified that he would "retain jurisdiction for the specific purpose of resolving any disputes that may arise between the parties about the application or interpretation of this awarded remedy."

The Company sought review of the McKee Award under § 301 of the Labor Management Relations Act. 29 U.S.C. § 185. The district court affirmed the arbitration award. The Company argued that the McKee Award should be vacated because it "fails to draw its essence from the [CBA]." *See Hoffman v. Cargill, Inc.*, 236 F.3d 458, 461 (8th Cir. 2001). The district court disagreed, granting the Union's

motion for summary judgment. Giving due deference to the arbitrator's decision, the court examined each of Arbitrator McKee's findings and concluded that Arbitrator McKee did not exceed his authority. In particular, the court found that Arbitrator McKee was not bound by previous arbitration awards, such as the Heinsz Award, "because the instant grievance does not involve the same issue under the same facts and circumstances as the prior *Heinsz* arbitration." The court also rejected the Company's argument that by retaining jurisdiction, Arbitrator McKee violated the *functus officio* doctrine that holds that "once an [arbitrator] renders a decision regarding the issues submitted, [he] becomes *functus officio* and lacks any power to reexamine that decision." *Domino Grp., Inc. v. Charlie Parker Mem'l Found.*, 985 F.2d 417, 420 (8th Cir. 1993) (quotation and citation omitted). The district court found that Arbitrator McKee's retention of jurisdiction was based on the need to address problems that may arise in implementation of the award, such as the determination of how much each grievant is due based on the number of weeks they worked two tours or more. The court determined that this did not violate the *functus officio* doctrine, which was meant "to limit the 'potential evil' of outside communications affecting an arbitration award."

## II. *Discussion*

On appeal, the Company seeks our review of the McKee Award contending that it fails to draw its essence from the CBA. In addition, the Company argues that the district court erred by finding that Arbitrator McKee was not bound by previous arbitration awards, the Heinsz Award in particular. Finally, the Company argues that Arbitrator McKee's retention of jurisdiction was improper. "We review de novo both the district court's grant of summary judgment and the court's legal conclusions in its denial of a motion to vacate an arbitration award." *Trailmobile Trailer, LLC v. Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers, AFL–CIO*, 223 F.3d 744, 746 (8th Cir. 2000) (internal citations omitted).

When reviewing an arbitration award, "we . . . accord 'an extraordinary level of deference' to the underlying award itself." *Boise Cascade Corp. v. Paper Allied-Indus., Chem. & Energy Workers (PACE), Local 7-0159*, 309 F.3d 1075, 1080 (8th Cir. 2002) (quoting *Keebler Co. v. Milk Drivers & Dairy Emps. Union, Local No. 471*, 80 F.3d 284, 287 (8th Cir. 1996)). Thus, our review of arbitration awards is extremely limited, and we are not to review the merits. *Osceola Cnty. Rural Water Sys., Inc. v. Subsurfco, Inc.*, 914 F.2d 1072, 1075 (8th Cir. 1990) (citation omitted). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paper Workers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987). Thus, "[w]e may not set an award aside simply because we might have interpreted the agreement differently or because the arbitrators erred in interpreting the law or in determining the facts." *Hoffman*, 236 F.3d at 462 (quotation and citation omitted).

While this deference makes it an "unusual circumstance[]" when we overturn an arbitration award, *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995), arbitration awards are not immune from judicial oversight. We will overturn an award if "it is completely irrational or evidences a manifest disregard for the law." *Hoffman*, 236 F.3d at 461 (quotations and citations omitted). "An arbitration decision may only be said to be irrational where it *fails to draw its essence from the agreement*, and an arbitration decision only manifests disregard for the law where the arbitrators clearly identify the applicable, governing law and then proceed to ignore it." *Id.* at 461–62 (emphasis added) (citing *Stroh Container Co. v. Delphi Indus.*, 783 F.2d 743, 749–50 (8th Cir. 1986)).

A. *Drawing Its Essence From the Agreement*

The Company argues that the McKee Award should be vacated because it fails to draw its essence from the CBA in the following respects: First, Arbitrator McKee failed to consider the parties' bargaining history and improperly considered prior

arbitration awards in his interpretation of the term "qualified." Second, Arbitrator McKee imposed new obligations and improperly departed from previous arbitration awards in his interpretation of the term "temporarily scheduled or assigned." Third, Arbitrator McKee improperly ignored previous arbitration awards and undisputed evidence when he found that CSRs performed higher-classified work.

### 1. *"Qualified"*

The Company begins by arguing that Arbitrator McKee ignored the undisputed bargaining history of the CBA in his interpretation of the term "qualified." "[I]f an arbitrator attempts to interpret a written agreement that is silent or ambiguous without considering the parties' intent, his award will fail to draw its essence from the [agreement]." *Boise Cascade*, 309 F.3d at 1082 (citing *Bureau of Engraving, Inc. v. Graphic Commc'ns Int'l Union, Local 1B*, 164 F.3d 427, 429 (8th Cir. 1999)). Thus, the Company contends that the McKee Award failed to consider the parties' intent by failing to consult the undisputed bargaining history of the term "qualified." The Company cites both *Boise Cascade*, 309 F.3d at 1084 and *Bureau of Engraving*, 164 F.3d at 429, as two analogous cases in which this court vacated arbitration awards when the arbitrator did not consider evidence of the parties' intent.

We reject the Company's argument, however, because Arbitrator McKee *did* in fact address the parties' intent by explicitly considering "the bargaining history introduced by the Company." Arbitrator McKee found that whatever the Company negotiated for, it is clear that the Union did not agree to change the language or otherwise bow to their interpretation of the term "qualified." Our narrow review precludes us from reviewing the factual accuracy of Arbitrator McKee's finding. *See Boise Cascade*, 309 F.3d at 1084.

Arbitrator McKee's interpretation of the term "qualified" followed prior arbitration awards. "[A]n arbitrator generally has the power to determine whether a prior award is to be given preclusive effect . . . ." *Trailways Lines, Inc. v. Trailways,*

*Inc. Joint Counsel*, 807 F.2d 1416, 1425 (8th Cir. 1986) (citing *Conn. Light & Power Co. v. Local 420, Int'l Bhd. of Elec. Workers*, 718 F.2d 14, 20 (2d Cir. 1983)); *see also W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 764–65 (1983) (holding that an arbitrator's conclusion that he was not bound by a prior arbitrator's decision was binding on the federal courts). Thus, Arbitrator McKee's reliance on the interpretation of the term "qualified" in the *U-Verse* arbitration and his *Senior Report Clerks* arbitration decision was within his purview and is not subject to our review.

### 2. *Temporarily Scheduled or Assigned*

Next, the Company argues that the McKee Award misconstrues the term "temporarily scheduled or assigned" and thus imposes a new obligation on the Company not bargained for in the CBA. The Company relies upon our decision in *Keebler* to support its position. 80 F.3d 284 (8th Cir. 1996). Because *Keebler* is not apposite, we are unpersuaded.

In *Keebler*, a company and its union entered into a CBA and subsequently a side agreement to the CBA governing the sales and delivery of food products. *Id.* at 286. When a dispute arose, the parties settled the dispute and issued a settlement letter governing the settlement. *Id.* When a second dispute arose, the case was arbitrated. *Id.* This court vacated the arbitrator's award in favor of the union because we found that the arbitrator based his award on the settlement letter and not on the language of the CBA or the side agreement. *Id.* at 288 ("The arbitrator found that [the company]'s obligation to obtain [the union's] agreement arose under the settlement letter, to which the arbitrator apparently also looked to discern the parties' intent under the [CBA] and the side agreement."). In this case, however, Arbitrator McKee based his award solely on the ambiguous language "temporarily scheduled or assigned" found in the CBA.

-11-

Arbitrator McKee's interpretation relied upon previous arbitration decisions that addressed the same issue in *Senior Report Clerks* and *U-Verse*. The interpretation that a work assignment is temporary until the Company has changed the job description of the lower-job classification to include the higher-classified work was first articulated by McKee in *Senior Report Clerks*, then adopted by Arbitrator Dana Eischen in his *U-Verse* decision. Arbitrator McKee recognized, however, that this interpretation was contrary to the interpretation of temporariness in the Heinsz and Fowler Awards. As we stated in *Trailways*, "we recognize that there may be situations where an arbitrator will refuse to defer to a prior award involving the same issue," including when "'(1) [t]he previous decision was clearly an instance of bad judgment; (2) the decision was made without the benefit of some important and relevant facts or considerations; or (3) new conditions have arisen questioning the reasonableness of the continued application of the decision.'" 807 F.3d at 1425 n.16 (quoting F. Elkouri & E. Elkouri, *How Arbitration Works* 428 (BNA 4th ed. 1985)).

Arbitrator McKee explained his declination of deference to a prior award involving a similar dispute by stating his disagreement with the prior decisions's interpretation of the contract's provisions. According to Arbitrator McKee, the Heinsz and Fowler Awards interpreted temporariness in a manner that gave the Company an incentive to violate the CBA as long as they violated it consistently for a given amount of time (or at least until the higher-classified job functions were performed long enough by lower-classified employees to be considered a permanent part of their job). Arbitrator McKee concluded that this interpretation was erroneous because it gave the Company the unilateral ability to render the temporariness requirement meaningless. In sum, Arbitrator McKee's decision to follow certain arbitration awards and not others, based upon those awards' factual and legal differences, does not authorize us to vacate his award under *Trailways*.

### 3. *Performance of Higher-Classified Work*

The Company also argues that the McKee Award inexplicably departed from the Heinsz Award's interpretation of performing higher-classified work. Unlike in the issue of temporarily assigned work, Arbitrator McKee failed to distinguish prior similar arbitral awards involving the same performance of higher-classified work.

In *Trailways*, we commented on our "grave concerns" when an arbitrator did not give precedential effect to a prior arbitration award. 807 F.2d at 1425. *Trailways* involved two grievances regarding an employer's "no beard" policy. *Id.* at 1417. The two grievances were raised by different groups of employees represented by the same union. *Id.* Both grievances were arbitrated. Even though the arbitrations "involved the same company, the same union, essentially the same issue, and interpretation of the same contract," *id.* at 1425, they reached different conclusions. *Id.* at 1418–19. Whereas the first arbitration award found for the company, the second arbitration award "did not discuss the similar nature of the two grievances and why, in light of this fact, the [first arbitration award] was not to be given preclusive effect." *Id.* at 1425. "[A]lthough not the basis of our decision," we stated that "[i]f an arbitrator does not accord any precedential effect to a prior award in a case like this, or at least explain the reasons for refusing to do so, it is questionable when, if ever, a 'final and binding' determination will evolve from the arbitration process." *Id.* at 1425–26. On the issue of performing higher-classified work, Arbitrator McKee did not apply the *Trailways* standard by at least explaining his reasons for departing from the Heinsz Award.

While Arbitrator McKee did not have to follow the Heinsz Award, he at least should have explained his departure—as he did for the temporariness issue outlined above—under *Trailways*. 807 F.2d at 1425–26; *see also Am. Nat'l Can Co. v. United Steelworkers of America*, 120 F.3d 886, 891–92 (8th Cir. 1997) (acknowledging the burden on arbitrators under *Trailways*, but nevertheless finding that *Trailways* was satisfied because the arbitrator "specifically identified the critical factual differences

-13-

between the arbitral decisions cited by ANC and the case before him and, based upon those material distinctions, determined that no preclusive effect should be accorded the two prior decisions.").

Nevertheless, an arbitrator's error in failing to give precedential or preclusive effect to a previous arbitration award is not alone sufficient to vacate an arbitration award. *Am. Nat'l Can Co.*, 120 F.3d at 892 (finding "that inconsistency with another award is not enough in itself to justify vacating an award . . . [and] that neither award will be set aside where both draw their essence from the collective bargaining agreement." (alterations in original) (quoting *McGraw Edison, Wagner Div. v. Local 1104, Int'l Union of Elec., Radio & Mach. Workers*, 767 F.2d 485, 489 (8th Cir. 1985))). Therefore, as long as Arbitrator McKee's interpretation draws its essence from the CBA, we will uphold the award, despite the Heinsz Award precedent. *See id.* at 893.

Taking into account Arbitrator McKee's findings that the CSRs performed work that was not a part of their job classification but was a part of the SRs' job classification, we conclude that Arbitrator McKee's interpretation drew its essence from the CBA. The applicable language of § 7 requires compensation to employees who "do[] work in a position with a higher established maximum rate of pay." While the Heinsz Award interpreted this language to require that the work at issue was exclusively performed by higher job classifications, Arbitrator McKee interpreted the "key [a]s whether the functions being performed by the lower-rated job title are 'clearly attributable' to a higher-paid job." While the two interpretations are not perfectly congruous, we cannot say that Arbitrator McKee's interpretation fails to draw its essence from the CBA. Therefore, we will not vacate the McKee Award based on the arbitrator's interpretation of the CBA or its inconsistency with the Heinsz Award.

## B. *Retention of Jurisdiction*

Finally, the Company argues that the McKee Award should be vacated because it improperly retains jurisdiction in violation of the *functus officio* doctrine. Also, the Company contends that the McKee Award erroneously reforms the CBA by imposing new obligations beyond what the parties negotiated in the CBA. The Company argues that Arbitrator McKee is attempting to give the Union a second bite of the apple. The Company believes retaining jurisdiction would enable the union to adduce missing evidence to avoid a failure of proof on whether grievant CSRs worked two tours or more for each week they are seeking a pay differential.

First, Arbitrator McKee's retention of jurisdiction does not give the Union further opportunity to prove the prima facie elements of their case. While the Company argues that Arbitrator McKee found that the Union had not carried their burden of showing that the grievant CSRs had worked two tours or more a week, he actually found the exact opposite. Although the evidence was described as "uneven" on this topic, Arbitrator McKee found that the grievant CSRs "satisfie[d] the requirement that the work be performed 'throughout two or more full tours per week.'" Therefore, as it pertained to *liability*, the Union had met its burden of showing that the Company violated the CBA. As it pertained to the *amount* due to each grievant, Arbitrator McKee was persuaded by the Company's evidence of the possibility "that *each* of the CSRs did not perform [the higher-classified] work throughout two or more tours *each* work week after their training occurred." According to this finding, Arbitrator McKee found that "[t]he Grievants are entitled to be made whole for their losses," but retained jurisdiction "for the specific purpose of resolving any disputes . . . about the application or interpretation of this awarded remedy." To the extent the parties could not agree on the amount of compensation due to each grievant, Arbitrator McKee could then consider evidence to determine during which weeks each CSR worked two or more tours that would determine the dollar amount of the award.

-15-

For the same reasons, Arbitrator McKee's retention of jurisdiction does not violate the *functus officio* doctrine. This court recognizes the "general rule in common law arbitration that when arbitrators have executed their awards and declared their decision they are functus officio and have no power to proceed further." *Local P-9, United Food & Commercial Workers Int'l Union, AFL-CIO v. George A. Hormel & Co.*, 776 F.2d 1393, 1394 (8th Cir. 1985) (quotation and citation omitted). The *functus officio* doctrine only applies, however, when an arbitration award is considered a final award. *See id.*; *Legion Insurance Co. v. VCW, Inc.,* 198 F.3d 718, 720 (8th Cir. 1999).

In *Local 36, Sheet Metal Workers International Association, AFL-CIO v. Pevely Sheet Metal Co.*, we upheld an arbitrator's retention of jurisdiction under circumstances similar to these. 951 F.2d 947, 949 (8th Cir. 1992). In *Pevely Sheet Metal*, a board that resembled a panel of arbitrators upheld a union's grievance on August 4, 1988, but retained jurisdiction in case the parties could not stipulate to the amount of back pay owed to the grievants. *Id.* at 948. When the parties were unable to resolve the issue of damages, the board considered evidence at a hearing and issued an award with a specific dollar amount. *Id.* at 948–49. We upheld the board's retention of jurisdiction and ultimate revisitation of the award because the original award was not final.

> Although the August 4, 1988, determination of liability was more than just a procedural event, it was not a final order. . . . The August 4, 1988, order specifically contained a provision whereby the [board] retained jurisdiction if the parties were unable to reach an agreement as to damages. [The union] had no arbitration award to enforce until damages were determined. The August 4, 1988, decision, while it was final as to liability, was not intended to be a final enforceable award as is shown by the [board]'s retaining jurisdiction.

*Id.* at 949. Similarly, while the McKee Award decided liability, it is not a final order until the amount of the award is eventually determined.

The Company relies primarily on *Legion Insurance* to support its argument that the McKee Award was a final award that triggered the *functus officio* doctrine. 198 F.3d 718 (8th Cir. 1999). In *Legion Insurance*, an arbitration panel's initial award found that VCW was liable to Legion Insurance because it had not remitted insurance premiums. *Id.* at 719. The arbitrator later rescinded its award ordering VCW to pay the premiums. *Id.* On appeal, VCW sought to uphold the recision of the original award on the basis that it was not final because the arbitrators "still had to decide additional issues, such as the amount of adjustments to the award of premiums." *Id.* at 720. We acknowledged that "[a]n award cannot be final if significant issues still need to be determined." *Id.* Notwithstanding, "we do not think that a minor adjustment to the award creates an important issue." *Id.* A minor adjustment to a pecuniary award is quite different than the initial determination of the award's amount. In *Pevely Sheet Metal*, we rejected a similar argument "that the determination of damages was [merely] a 'ministerial' detail" because "the determination of damages did not merely involve a simple calculation, but required the resolution of significant issues." 951 F.2d at 949. We find that the factual determination of how many tours each CSR worked during which weeks is more akin to the significant issues in *Pevely Sheet Metal* rather than the minor adjustment to an award in *Legion Insurance*. Therefore, the McKee Award is not final and the *functus officio* doctrine is not triggered.

The Company also argues that Arbitrator McKee's retention of jurisdiction subjects them to a piecemeal hearing process that imposes new obligations on the parties that is foreign to what they bargained for in the CBA. In the *Steelworkers* trilogy, the Supreme Court said that parties that submit to arbitration bargain for the arbitrator's "judgment and all that it connotes." *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960). Because the "amounts due [to grievant]

-17-

employees" is a part of the judgment of an arbitrator, *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599 (1960), we find no merit to the Company's argument. Arbitrator McKee's ultimate determination of the amount due to employees is the very procedure and remedy the Company and the Union bargained for in the CBA when they negotiated an arbitration clause.

## III. *Conclusion*

For the reasons stated herein, we affirm the district court's judgment enforcing the McKee Award.

———————————————————