# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1438

_____

National Football League Players Association, on its own and on behalf of Adrian Peterson,

*Plaintiff - Appellee,*

v.

National Football League; National Football League Management Council,

*Defendants - Appellants.*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 19, 2015
Filed: August 4, 2016

_____

Before LOKEN, MURPHY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

During the 2014 football season, National Football League Commissioner Roger Goodell suspended Minnesota Vikings running back Adrian Peterson indefinitely for "conduct detrimental to . . . the game of professional football," and fined Peterson a sum equivalent to six games' pay. Peterson's suspension stemmed from his plea of *nolo contendere* in November 2014 to a charge of misdemeanor

reckless assault on one of his children. Peterson appealed his discipline to an arbitrator, who affirmed the suspension and fine.

Peterson petitioned the district court to vacate the arbitration decision. The court granted the petition, and the League appeals. After the district court ruled, the Commissioner reinstated Peterson. He has resumed playing professional football, and this appeal does not involve his eligibility to play. The remaining dispute concerns whether the League may collect the fine imposed by the Commissioner and upheld by the arbitrator. We conclude that the parties bargained to be bound by the decision of the arbitrator, and the arbitrator acted within his authority, so we reverse the district court's judgment vacating the arbitration decision.

I.

The NFL Players Association is the exclusive collective bargaining representative for present and future players in the National Football League. Collective Bargaining Agreement pmbl. (2011) [hereinafter "CBA"]. The Association is party to a comprehensive collective bargaining agreement with the NFL Management Council, the bargaining representative of the League's thirty-two separately owned teams. *Id.* Relevant to this appeal, the Agreement prescribes a comprehensive system governing discipline of players imposed by teams or the League and provides for the arbitration of disciplinary appeals by players. *Id.* arts. 42-43, 46.

The Commissioner is the chief executive officer of the NFL. Article 46 of the Agreement authorizes the Commissioner to impose discipline for "conduct detrimental to the integrity of, or public confidence in, the game of professional football." *Id.* art. 46, § 1(a). The standard NFL player contract further acknowledges that the Commissioner has the power "to fine Player in a reasonable amount; *to suspend Player for a period certain or indefinitely*; and/or to terminate this contract."

*Id*. app. A ¶ 15 (emphasis added). The Agreement does not define "conduct detrimental" or prescribe maximum or presumptive punishments for such conduct.

The Agreement establishes an exclusive arbitration process for resolving disputes over player discipline. Any player sanctioned under Article 46 for conduct detrimental to the game has the right to appeal to the Commissioner. *Id.* art. 46, §§ 1(a), 2(a). The Commissioner may hear the appeal himself, or he may designate one or more persons to serve as hearing officers. *Id.* § 2(a).

Pursuant to Article 46, the Commissioner has promulgated a Personal Conduct Policy that applies to all players. The Policy specifies behavior that may be considered "conduct detrimental," explains the types of penalties violators may receive, and describes the procedures for imposing and appealing Commissioner discipline. Players are advised that "[d]iscipline may take the form of fines, suspension, or banishment from the League," and that violators might also be required to undergo clinical evaluation or mental health treatment.

The Personal Conduct Policy effective June 1, 2013, listed various forms of off-the-field conduct, including domestic violence, that could subject a player to discipline for conduct detrimental. The Policy does not establish maximum or presumptive punishments; rather, it provides that discipline will depend on "the nature of the incident, the actual or threatened risk to the participant and others, any prior or additional misconduct . . . , and other relevant factors." An identical policy was reissued on June 1, 2014.

On August 28, 2014, Commissioner Goodell sent a letter to all NFL owners to "communicate our position and strengthen our policies on domestic violence and sexual assault." An attached memorandum to all NFL personnel explained that violations of the Personal Conduct Policy involving domestic violence would be subject to "enhanced discipline." These communications followed criticism of the

League's handling of a highly publicized incident of domestic violence involving Baltimore Ravens running back Ray Rice. In July 2014, the Commissioner suspended Rice without pay for the first two games of the 2014 season and fined Rice an additional week's salary after Rice was charged with assaulting his then-fiancée. The NFL and Goodell were sharply criticized in many quarters for treating Rice too leniently.

The August 2014 communications outlined measures to "reinforce and enhance" the League's approach to domestic violence. Specifically, the memorandum announced that a first domestic violence offense would be subject to a suspension of six weeks without pay, and that more severe discipline would be imposed if aggravating circumstances were present. Goodell's letter to the owners said that the enhanced discipline was "consistent with [the League's] Personal Conduct Policy."

Adrian Peterson entered the NFL in 2007 and has spent his entire career with the Minnesota Vikings. On September 11, 2014—two weeks after Goodell issued the August 2014 communications—a Texas grand jury indicted Peterson for felony injury to a child. The indictment alleged that in May 2014, Peterson hit his four-year-old son with a tree branch as a form of corporal punishment. The punishment reportedly inflicted "cuts and bruises to the child's back, buttocks, ankles, legs, and scrotum, along with defensive wounds to the child's hands." App. 704. Peterson was quoted as telling investigators that he would "never eliminate whooping my kids . . . because I know how being spanked has helped me in my life." App. 705. After the charge was announced, Peterson agreed to take a paid leave from the team pending adjudication of his criminal case.

On November 4, 2014, Peterson pleaded *nolo contendere* to a reduced charge of reckless assault, a class A misdemeanor. Two weeks later, Goodell suspended Peterson indefinitely (for a minimum of the six games remaining in the 2014 season),

fined him six-weeks' salary, and required him to meet with a League-appointed psychiatrist. Goodell relied on the "baseline discipline" of a six-game suspension that was announced in the August 2014 memorandum. Goodell also identified several aggravating circumstances that merited the lengthy suspension: the age and vulnerability of the child, the emotional and psychological trauma inflicted on a young child, and Peterson's lack of remorse and suggestion that he would not refrain from engaging in similar conduct in the future. Goodell told Peterson that he would periodically review Peterson's progress towards reinstatement, with the first review to occur in April 2015.

The Players Association appealed on Peterson's behalf under the procedures of the Collective Bargaining Agreement. The Commissioner designated Harold Henderson to hear Peterson's appeal. Henderson is the president of the Player Care Foundation, a League-affiliated charity. He previously served for sixteen years as the League's vice president for labor relations and chairman of the NFL Management Council Executive Committee. The Association asked Henderson to recuse himself from the hearing due to his close ties to League officials and his role in shaping the League's disciplinary policies. Henderson denied the request, noting that the Association had not objected to his designation as arbitrator in dozens of past disciplinary appeals.

The Players Association's primary argument before Arbitrator Henderson was that custom and practice under the Personal Conduct Policy in effect at the time of Peterson's misconduct limited the Commissioner's disciplinary authority to a maximum two-game suspension for a first-time domestic violence offense. The Association argued that Goodell was required to apply the policies in force on the date of the misconduct, and asked the arbitrator to reduce Peterson's punishment to a two-game suspension and a fine equivalent to two-weeks' salary. The Association also challenged the process by which Peterson's discipline was determined and the conditions placed on his reinstatement, accusing the League of "making up the

process and punishment as it goes." The Personal Conduct Policy issued June 1, 2013, was in effect on the date of Peterson's offense, and an identical policy was reissued on June 1, 2014, so references to either version address the policy in place at the time of the misconduct.

The arbitrator affirmed Peterson's discipline, finding that it was "fair and consistent." He concluded that the August 2014 communications did not constitute a change of the Personal Conduct Policy, but rather "reinforce[d] that policy with initiatives to explain and enhance it." He observed that the Personal Conduct Policy, which had not been rescinded, authorized suspensions and provided that "[t]he specifics of the disciplinary response will be based on the nature of the incident" and other relevant factors. The arbitrator explained that the Commissioner has "broad discretion" under Article 46 of the Agreement and the Personal Conduct Policy, and concluded that the August 2014 pronouncements "simply reflect his current thinking on domestic violence and other incidents involving physical force."

The arbitrator quoted from a prior arbitration decision in 2010 concerning the suspension of a Miami Dolphins player:

> The Commissioner has considerable discretion in assessing discipline. If he should determine that the current level of discipline imposed for certain types of conduct has not been effective in deterring such conduct, it is within his authority to increase discipline in such cases. He is not forever bound to historical precedent.

Add. 21 (quoting App. 308). In the *Dolphins Player* case, the player argued that a one-game suspension for domestic violence was inconsistent with prior cases in which the League had imposed only fines for first-time domestic violence offenses. The arbitrator there observed, however, that "domestic violence is an area where discipline has been increased, and a suspension for a first offense is now the norm rather than the exception. [The Commissioner] should not be handcuffed by prior

-6-

cases." App. 308. In Peterson's case, the arbitrator reasoned that just as the Commissioner was permitted to begin suspending, rather than fining, players for first-time offenses in 2010, he had "broad discretion" to increase the magnitude of suspensions and fines in 2014 if he concluded that past sanctions had been an insufficient deterrent.

The arbitrator also rejected the Players Association's contention that the Commissioner's discipline of Peterson was inconsistent with an arbitrator's decision in the Ray Rice case. Although the Commissioner initially suspended Rice for two games, he later changed the punishment to an indefinite suspension after a website published video footage of Rice's assault. An arbitrator vacated the indefinite suspension, finding that the second suspension was an arbitrary repunishment for misconduct that already had been punished. The *Rice* arbitrator opined, however, that "[i]f this were a matter where the *first discipline imposed* was an indefinite suspension, an arbitrator would be hard pressed to find that the Commissioner had abused his discretion." App. 60-61 (emphasis added). Arbitrator Henderson thus concluded that the Commissioner's indefinite suspension of Peterson was not inconsistent with the reasoning in *Rice*.

The arbitrator then stated that it was unnecessary to find whether the June 2014 policy and the August 2014 communications were "a single policy or two, or which one was applied, because the result is the same in either instance." He explained that the Commissioner's discipline of Peterson fit both the Personal Conduct Policy and the August 2014 communications. The arbitrator acknowledged that Peterson's discipline was more severe than in most prior domestic violence cases, but found that the "severe beating of a four year old child" was "arguably one of the most egregious cases of domestic violence in this Commissioner's tenure." He said that "[t]here is no comparing this brutal incident to the typical violence against another adult."

The arbitrator rejected the Players Association's argument that Peterson lacked fair notice of the potential punishment. He found no evidence that Peterson knew what level of discipline had been imposed in prior domestic violence cases or that he relied in any way on an understanding about potential disciplinary measures. The arbitrator distinguished a case involving a "fine for missing the last few minutes of a Thursday practice" and other cases cited by the Association, finding no reason to believe that "Peterson might not have inflicted those injuries on his young son if he had known he could be suspended six weeks rather than two." The arbitrator saw no lack of basic fairness in the Commissioner's approach. Accordingly, the arbitrator denied the grievance and affirmed the Commissioner's discipline of Peterson.

The Players Association petitioned the district court to vacate the arbitration award. The Association argued that the case involved "the rare Arbitration Award that must be set aside" and sought to vacate the award on four grounds, alleging: (1) the Commissioner retroactively punished Peterson, in violation of the Collective Bargaining Agreement; (2) the arbitrator exceeded his authority by hypothesizing whether the Commissioner could have disciplined Peterson in the same manner prior to the August 2014 memorandum; (3) the arbitrator was evidently partial; and (4) the award violated the principle of fundamental fairness.

The district court accepted the Association's first two arguments and granted the petition. First, the court ruled that the Commissioner retroactively applied a new disciplinary standard to Peterson, in violation of the Collective Bargaining Agreement as interpreted by past arbitration awards. The district court concluded that the August 2014 communications effected a "New Policy" that "cannot be applied retroactively, notwithstanding the Commissioner's broad discretion in meting out punishment under the CBA." The district court found "no valid basis" for the arbitrator's distinction of the award in *Rice* and faulted the arbitrator for failing to "explain why the well-recognized bar against retroactivity did not apply to Peterson." The district court also ruled that the arbitrator "exceeded his authority by adjudicating the hypothetical

question of whether Peterson's discipline could be sustained under the previous Policy." The court concluded that the arbitrator's authority was limited to deciding the question presented by the Players Association—namely, "'the pure legal issue' of whether the New Policy could be applied retroactively."

The League appeals the district court's order. After the district court ruled, the Commissioner reinstated Peterson to play football, and this appeal concerns only the monetary sanction imposed by the Commissioner and upheld by the arbitrator. We review the district court's decision *de novo*. *Alcan Packaging Co. v. Graphic Commc'n Conference*, 729 F.3d 839, 841 (8th Cir. 2013).

## II.

In an arbitration case like this one, the role of the courts is very limited. *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam). This case arises under the Labor Management Relations Act of 1947, in which Congress evinced a preference "for private settlement of labor disputes without the intervention of government." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37 (1987). We thus do not apply our own view of what would be appropriate player discipline, and we do not review whether the arbitrator "correctly" construed the Collective Bargaining Agreement when he reviewed the Commissioner's decision. "It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599 (1960). So long as the arbitrator "is even arguably construing or applying the contract and acting within the scope of his authority," the arbitral decision must stand. *Misco*, 484 U.S. at 38. Vacatur of an arbitration award is appropriate only when the decision does not "draw[] its essence from the collective bargaining agreement," and the

arbitrator instead has "dispense[d] his own brand of industrial justice." *Enter. Wheel*, 363 U.S. at 597.

The gravamen of the Players Association's petition is that the arbitrator ignored "law of the shop" that forbids the retroactive application of a new disciplinary policy to Peterson. The Association maintains that industrial common law developed under the Personal Conduct Policy before Peterson's misconduct constrained the League to impose no more than a two-game suspension for a first-time domestic violence infraction. The Association argues that the Commissioner relied on a "new policy" set forth in the August 2014 communications to impose a more severe penalty on Peterson, and that the arbitrator ignored the law of the shop when he upheld the discipline. The district court, relying primarily on the *Rice* arbitration, ruled that the arbitrator "simply disregarded the law of the shop."

To be sure, "the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *United Steel Workers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 581-82 (1960). We have said, therefore, that "[t]he essence of the CBA is derived not only from its express provisions, but also from the industrial common law." *Bureau of Engraving, Inc. v. Graphic Commc'ns Int'l Union*, 164 F.3d 427, 429 (8th Cir. 1999). At the same time, however, "an arbitrator's error in failing to give precedential or preclusive effect to a previous arbitration award is not alone sufficient to vacate an arbitration award." *SBC Advanced Sols., Inc. v. Commc'ns Workers, Dist. 6*, 794 F.3d 1020, 1030 (8th Cir. 2015); *see Am. Nat'l Can Co. v. United Steelworkers*, 120 F.3d 886, 892-93 (8th Cir. 1997). An arbitrator acts within his authority as long as he is arguably construing or applying the contract, even if a court disagrees with the arbitrator's construction or application. *Misco*, 484 U.S. at 38. The same holds true for the law of the shop: as long as the arbitrator is arguably construing or applying arbitral precedents, a court's disagreement with the arbitrator's application of

-10-

precedent is not sufficient grounds to vacate an arbitration decision. *See Am. Nat'l Can*, 120 F.3d at 892-93.

The district court concluded that the arbitrator ignored the law of the shop set forth in the *Rice* decision—namely, that the "new policy" arising from the August 2014 communications cannot be applied retroactively. But the arbitrator addressed *Rice* head-on. He explained that *Rice* involved *second* discipline imposed on a player for conduct that was already subject to a suspension and fine, whereas Peterson's sanction was the *first* discipline imposed. The arbitrator also quoted language from the *Rice* decision that plainly supports upholding the Commissioner's decision on Peterson: "If this were a matter where the first discipline imposed was an indefinite suspension, an arbitrator would be hard pressed to find that the Commissioner had abused his discretion." App. 60-61.

The district court disagreed with the arbitrator's decision and found "no valid basis to distinguish this case from the *Rice* matter." In resolving a motion to vacate an arbitration award, however, the question for the courts is not whether the arbitrator's distinction is persuasive enough to withstand ordinary judicial review. An erroneous interpretation of a contract, including the law of the shop, is not a sufficient basis for disregarding the conclusion of the decisionmaker chosen by the parties. *Misco*, 484 U.S. at 38; *Alcan Packaging*, 729 F.3d at 843. The dispositive question is whether the arbitrator was at least arguably construing or applying the contract, including the law of the shop. The arbitrator here undoubtedly construed the *Rice* decision in reaching his decision. Disagreement with his conclusion is not a valid ground on which to vacate the decision.

Aside from the *Rice* decision, the Players Association contends that the arbitrator ignored other arbitral precedents that establish a prohibition on retroactive punishment. The arbitrator, however, disagreed with the Association's premise that the Commissioner applied a "new" policy that called for discipline that was

-11-

unavailable under the "old" policy. He concluded instead that the August 2014 communications "do not constitute a change" of the preexisting Personal Conduct Policy, because the communications did not effect a change in the Commissioner's disciplinary power.

The arbitrator relied on the Collective Bargaining Agreement and the law of the shop to reach this conclusion. The Agreement gives the Commissioner discretion to impose fines and suspensions for conduct detrimental to the game. The Personal Conduct Policy allows for fines and suspensions based on the nature of the incident and other relevant factors; it does not establish maximum punishments. Citing the 2010 *Dolphins Player* decision, the arbitrator reasoned that the Commissioner "is not forever bound to historical precedent," and that "[i]f he should determine that the current level of discipline imposed for certain types of conduct has not been effective in deterring such conduct, it is within his authority to increase discipline in such cases." As applied to Peterson's case, therefore, the arbitrator thought the terms of the Agreement, the law of the shop, and the Personal Conduct Policy gave the Commissioner discretion to impose a six-game suspension and fine if he concluded that shorter suspensions in prior cases had been inadequate. The arbitrator's decision on this point was grounded in a construction and application of the terms of the Agreement and a specific arbitral precedent. It is therefore not subject to second-guessing by the courts.

The Players Association asserts that the arbitrator's conclusion is at odds with the Commissioner's own words. In a letter informing Peterson of his discipline, Goodell referred to "[t]he modifications to the Personal Conduct Policy that were announced on August 28." The Association also points to a press conference where Goodell said the League "made changes to our discipline" in August 2014. The Association argues that these statements "foreclose any claim that the Policies are really the same."

Other evidence, however, supports the arbitrator's conclusion that the August communications "reinforce[d]" the Personal Conduct Policy without changing it, by providing "initiatives to explain and enhance it." Article 46 and the Personal Conduct Policy by their terms place no limit on the Commissioner's authority to suspend players. In his August 2014 letter to NFL owners, Goodell described the attached memorandum and the six-game suspension for first-time domestic violence offenses as "*consistent with* our Personal Conduct Policy." App. 29 (emphasis added). And, as we have explained, the law of the shop included arbitral precedent stating that the Commissioner is not forever bound to historical precedent if prior discipline under the Personal Conduct Policy provided insufficient deterrence. In other words, the League might change its discipline without changing its policy.

The parties have delegated to the arbitrator the job of reconciling conflicting evidence. The arbitrator, having been presented with the Commissioner's statements, concluded that the August 2014 communications did not constitute a change of the Personal Conduct Policy. He necessarily found, therefore, that Goodell's statements were not admissions to the contrary. Courts are not permitted to review the merits of an arbitration decision even when a party claims that the decision rests on factual errors. *See Garvey*, 532 U.S. at 509; *Misco*, 484 U.S. at 39.

The Players Association further argues that the arbitrator ignored four arbitral decisions requiring advance notice to a player of the consequences of a violation. The arbitrator mentioned these decisions and found them distinguishable. A close reading of the prior decisions shows why. Three of the decisions involved team discipline; they did not involve discipline imposed by the Commissioner pursuant to Article 46. One of those decisions turned on the ambiguity of a team rule on the timing of weigh-ins. App. 299. A second decision, where a player missed a weigh-in, rested on a team's failure to comply with an article of the collective bargaining agreement that required timely publication of a list of designated offenses. App. 241-42. The third case was based largely on the arbitrator's view that the player's

misconduct (sitting out part of a practice) did not rise to the level of "conduct detrimental" to the team. App. 141-43. In the one decision that concerned Article 46 discipline, *In re Bounty*, the arbitrator relied on reasons other than inadequate notice or impermissible retroactivity in setting aside discipline of four players: insufficient evidence to distinguish a disciplined player from numerous others who were not disciplined and "tremendous pressure" on the player from coaches to commit misconduct, R. Doc. 1-6, at 14; inconsistent treatment between players and teams, *id.* at 18-19; selective enforcement against one player to the exclusion of others similarly situated, *id.* at 19-20; and insufficient evidence that a player's alleged actions were a factor causing misconduct on the playing field, *id.* at 22-23.

In any event, the question for a reviewing court is not whether the arbitrator's distinctions were correct, but whether the arbitrator was arguably construing and applying the contract and the law of the shop. The arbitrator applied the law of the shop: he relied on the *Dolphins Player* case concerning the Commissioner's authority to adjust disciplinary sanctions for domestic violence and concluded that precedents favored by the Players Association were distinguishable. *Dicta* from *Trailways Lines, Inc. v. Trailways, Inc. Joint Council*, 807 F.2d 1416, 1425 (8th Cir. 1986), concerning an arbitrator who ignored arbitral precedent without explanation or simply because he disagreed with it, are therefore inapposite. We see no basis for setting aside the decision under a federal court's limited scope of review.

The Players Association also argues that the arbitrator ignored an "admission" by Commissioner Goodell, when testifying in the *Rice* case, that he could not apply retroactively the "new" policy of imposing a six-game suspension for first-time domestic violence offenses. It cites Goodell's testimony that he called Rice shortly after the August 2014 communications and told Rice that the communications did not impact him, because "[h]e was given his discipline and we moved forward." According to the Association, this testimony shows that Goodell knew he could not apply the "new" policy to any player whose misconduct predated the August 2014

-14-

communications. The League responds that Goodell's testimony is not "law of the shop" and, in any event, the Commissioner meant only that he could not rediscipline the already-disciplined Rice.

The arbitrator obviously did not agree with the Association that Goodell's testimony in *Rice* was an admission that he could not apply a six-game suspension to Peterson. The meaning of Goodell's statement is a question of fact. Given the context of the *Rice* testimony, the arbitrator reasonably concluded that Goodell did not testify to one belief on November 5, 2014, and then act to the contrary two weeks later when he disciplined Peterson. In any case, a federal court may not set aside an arbitrator's decision based on "improvident, even silly, factfinding," so the Association's reliance on Goodell's testimony does not carry the day. *Garvey*, 532 U.S. at 509 (quoting *Misco*, 484 U.S. at 39).

III.

The Players Association argues alternatively that the arbitrator exceeded his authority in two ways. First, it complains that the arbitrator adjudicated a hypothetical discipline that the Commissioner never actually imposed. In its view, the Commissioner acted pursuant to a "new" policy instituted by the August 2014 communications, but the arbitrator considered the propriety of the discipline as though it had been imposed under the "old" June 2014 Personal Conduct Policy. The Association contends, therefore, that the arbitrator effectively imposed his own discipline under the "old" policy and thereby exceeded his authority.

We are not convinced that the arbitrator exceeded his authority in the manner alleged. The arbitrator concluded that the August 2014 communications did not change the June 2014 Personal Conduct Policy. He thus found it unnecessary to decide whether the Commissioner applied an "old" policy, a "new" policy, or simply a "single" policy that encompassed the writings from both June and August. In his

-15-

view, the characterization did not matter, because there was no change in policy, and "the result is the same" under any of the scenarios. It is apparent, therefore, that the arbitrator reviewed the Commissioner's decision, including his reliance on the August 2014 communications, and determined that the discipline imposed was permissible under the Collective Bargaining Agreement.

Second, the Players Association contends that the arbitrator exceeded his authority by altering the issues presented for decision. It argues that the arbitrator was limited to adjudicating "'the pure legal issue' of whether the New Policy could be applied retroactively." The district court agreed, concluding that the arbitrator "strayed beyond the issues submitted by the NLFPA."

It is true that "[w]hen *two parties submit* an issue to arbitration, it confers authority upon the arbitrator to decide *that* issue." *Local 238 Int'l Bhd. of Teamsters v. Cargill, Inc.*, 66 F.3d 988, 990-91 (8th Cir. 1995) (per curiam) (first emphasis added). But the parties here did not stipulate to the issues for arbitration. The scope of the arbitrator's authority, therefore, was itself a question delegated to the arbitrator. *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 765 (1983). "It is appropriate for the arbitrator to decide just what the issue was that was submitted to it and argued by the parties." *Int'l Chem. Workers Union v. Day & Zimmermann, Inc.*, 791 F.2d 366, 369 (5th Cir. 1986) (quotation omitted). And "an arbitrator's interpretation of the scope of the issue submitted to him is entitled to the same deference accorded his interpretation of the collective bargaining agreement." *John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers*, 913 F.2d 544, 560 (8th Cir. 1990) (quoting *Pack Concrete, Inc. v. Cunningham*, 866 F.2d 283, 285 (9th Cir. 1989)).

The Players Association seeks to limit the issue for arbitration to a question advanced in its opening statement before the arbitrator: "[W]hat we have is the pure legal issue as to whether . . . it is fair and consistent for the League to retroactively

apply the new policy to the May conduct." App. 72. But it is not the exclusive prerogative of the party seeking arbitration to define the issue for arbitration. *See John Morrell & Co.*, 913 F.2d at 560-61. The League framed the issue more broadly: "[I]s the discipline appropriate?" App. 81. The League maintained that the Commissioner has the authority to "impose levels of discipline that are higher than what has been imposed in past cases depending on the circumstances before him," and that Peterson's discipline was authorized by the Personal Conduct Policy. App. 89.

The arbitrator at least arguably acted within the scope of the issues submitted to him, so his decision must be upheld. *See W.R. Grace & Co.*, 461 U.S. at 764-65; *Int'l Bhd. of Elec. Workers, Local Union 824 v. Verizon Fla., LLC*, 803 F.3d 1241, 1246-47 (11th Cir. 2015); c*f. John Morrell & Co.*, 913 F.2d at 561 (vacating award where arbitrator was not "even arguably" acting within the scope of the issue submitted). The Players Association's framing of the issue assumed a premise that was contested by the League—namely, that the August 2014 communications constituted a new policy authorizing discipline that was not allowed under the preexisting policy. The arbitrator was not required to accept the Association's disputed premise; he properly asserted authority to resolve whether the premise was correct. The Association itself, moreover, raised arguments that required consideration of what discipline was permitted under the June 2014 Personal Conduct Policy. The Association urged the arbitrator to reduce Peterson's punishment to the maximum allowable at the time of Peterson's offense, and argued that "any punishment must be assessed and imposed consistent with the Policy and practices prior to August 28." App. 41. These contentions required the arbitrator to examine what level of discipline was authorized before the August 2014 communications. The arbitrator thus did not exceed his authority by considering whether the August 2014 communications constituted a change to the Personal Conduct Policy and whether Peterson's discipline was consistent with the preexisting policy.

IV.

The Players Association contends that two additional grounds, not addressed by the district court, also support vacating the arbitration award. These arguments involve purely legal issues in which additional evidence would not affect the outcome, so we proceed to address them. *See Universal Title Ins. Co. v. United States*, 942 F.2d 1311, 1314-15 (8th Cir. 1991). Neither alternative argument justifies vacating the decision.

The Association first asserts that Arbitrator Henderson was "evidently partial," because he demonstrated "such a degree of partiality that a reasonable person could assume that the arbitrator had improper motives." *Dow Corning Corp. v. Safety Nat'l Cas. Corp*, 335 F.3d 742, 750 (8th Cir. 2003) (quotation omitted). In *Williams v. National Football League*, 582 F.3d 863 (8th Cir. 2009), an NFL player raised a virtually identical challenge to the League's general counsel serving as an arbitrator in a dispute arising under the previous collective bargaining agreement. We held that the Association had "waived its objection to [the general counsel] serving as arbitrator by agreeing in the CBA that the Commissioner's designee . . . could serve as arbitrator." *Id.* at 885-86. Allowing the Commissioner or the Commissioner's designee to hear challenges to the Commissioner's decisions may present an actual or apparent conflict of interest for the arbitrator. But the parties bargained for this procedure, and the Association consented to it. *See* CBA art. 46 § 2(a). It was foreseeable that arbitration under the Agreement sometimes would involve challenges to the credibility of testimony from Goodell or other League employees. When parties to a contract elect to resolve disputes through arbitration, a grievant "can ask no more impartiality than inheres in the method they have chosen." *Winfrey v. Simmons Food, Inc.*, 495 F.3d 549, 551 (8th Cir. 2007) (quotation omitted). The Association's challenge to Henderson's service as arbitrator is thus foreclosed by *Williams*, and a remand is unnecessary. *Accord Nat'l Football League Mgmt. Council v. Nat'l Football Players Ass'n*, 820 F.3d 527, 548 (2d Cir. 2016).

-18-

The Association's remaining contention is that the arbitration was "fundamentally unfair." Fundamental fairness is a not a basis for vacatur identified in the Labor Management Relations Act or the Federal Arbitration Act. The latter statute informs our analysis in labor arbitration cases. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298 n.6 (2010); *Am. Postal Workers Union v. U.S. Postal Serv.*, 754 F.3d 109, 112 n.4 (2d Cir. 2014). Even assuming for the sake of analysis that there could be grounds for vacatur that are not specified in the statutes, *cf. Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 589 (2008), "our narrow construction of extra-statutory review militates against" adopting a "fundamental fairness" standard. *Hoffman v. Cargill, Inc.*, 236 F.3d 458, 462 (8th Cir. 2001). *Hoffman* did not "categorically reject the possibility of such a standard," but said that it could apply only "to arbitration schemes so deeply flawed as to preclude the possibility of a fair outcome." *Id.* at 462-63.

The Players Association does not identify any structural unfairness in the Article 46 arbitration process for which it bargained. The Association's fundamental fairness argument is little more than a recapitulation of its retroactivity argument against the merits of the arbitrator's decision. We have never suggested that when an award draws its essence from the collective bargaining agreement, a dissatisfied party nonetheless may achieve vacatur of the arbitrator's decision by showing that the result is "fundamentally unfair." The Association's fairness argument does not fit within the narrow window left open for consideration in *Hoffman*, and we therefore conclude that the contention is without merit.

\* \* \*

For the foregoing reasons, the judgment of the district court is reversed, and the case is remanded with directions to dismiss the petition.

———————————————