**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 25, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

HOLLYFRONTIER CHEYENNE
REFINING, LLC, a Delaware limited
liability company,

     Petitioner Counter Defendant-
Appellee,

v.

UNITED STEEL, PAPER AND
FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED
INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION
LOCAL 11-574, a Pennsylvania labor
organization,

     Respondent Counter Claimant-
Appellant.

No. 23-8046

_____

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:22-CV-00254-ABJ)**
_____

Submitted on the briefs:*

Anthony Resnick, Assistant General Counsel, United Steelworkers, Pittsburgh, PA, for
Defendant-Appellant.

_____

   * After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
submitted without oral argument.

John M. Husband and David S. Law, Holland & Hart LLP, Denver, CO, for Plaintiff-Appellee.

_____

Before **PHILLIPS**, **MORITZ**, and **EID**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

In 2021, HollyFrontier Cheyenne Refining, LLC ("HollyFrontier") transitioned a petroleum refinery into a renewable diesel production facility. As part of that transition, HollyFrontier reassigned work from hourly workers to salaried employees with higher levels of education and technical expertise. A Pennsylvania labor organization—United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union Local 11-574 (the "Union")—filed a grievance against HollyFrontier, alleging that HollyFrontier's reassignment of work violated the parties' collective bargaining agreement. After an arbitrator resolved that issue in HollyFrontier's favor, it concluded separately that the salaried employees must be included in the bargaining unit—an issue that neither party submitted for arbitration. HollyFrontier petitioned to vacate the arbitrator's decision, arguing the arbitrator had no authority to order the parties to include salaried employees in the bargaining unit because the parties did not submit that issue for arbitration. The district court granted HollyFrontier's petition.

The Union now appeals the district court's vacatur, claiming the arbitrator acted within the scope of his authority when he determined that the salaried employees must be included in the bargaining unit. We disagree. Based on the plain

language of the parties' briefs during arbitration, the parties limited the arbitrator's authority to resolution of only one issue: whether HollyFrontier's reassignment of work from hourly workers to salaried employees violated the parties' collective bargaining agreement. Because the arbitrator exceeded the bounds of his authority by resolving a question not submitted for arbitration, we affirm the district court's decision to vacate the arbitration award.

## I.

HollyFrontier operates an industrial refinery (the "Facility") in Cheyenne, Wyoming. Before this litigation, HollyFrontier employed hourly workers—called "Lab Technicians" and "Lab Testers"—to assist in the refinement and production of petroleum products, such as gasoline and diesel fuel. Together, the Facility's Lab Technicians and Lab Testers formed a bargaining unit, which was represented by the Union. Both HollyFrontier and the Union are parties to a collective bargaining agreement (the "CBA"), which requires the arbitration of certain grievances. The CBA also places certain limitations on arbitration via its "challenged provisions" clause, which provides that "[t]he sole authority of the arbitrator is to render a decision as to the interpretation and/or application of the challenged provision(s) of [the CBA.]" App'x Vol. II at 242.

In 2021, HollyFrontier transitioned the Facility from a petroleum refinery to a renewable diesel production facility, which produces diesel fuel from vegetable products. As part of that transition, HollyFrontier laid off many Lab Technicians and Lab Testers, claiming the Facility no longer required their services. HollyFrontier

3

began to rely more heavily on those holding a salaried position—the position of "Chemist"—which was made available only to individuals with degrees in chemistry. The Union then filed a grievance against HollyFrontier, alleging that HollyFrontier had violated the CBA by assigning Chemists work that was previously performed by Lab Testers.

After several failed attempts to resolve the Union's complaint, the parties submitted the issue for arbitration. The Union presented the issue as whether HollyFrontier "violate[d] the [CBA] when they replaced bargaining unit employees with salaried personal [sic] to preform [sic] laboratory work[,]" App'x Vol. I at 93, and asked that HollyFrontier "cease and desist from using salaried employees in the lab," *id.* at 98. HollyFrontier framed the issue similarly: It wanted the arbitrator to determine whether HollyFrontier had violated the CBA "by determining the work, methods, processes, assignment of work, work duties, the qualifications of the employees and the staffing requirements" for the Facility. *Id.* at 190. In April 2022, the arbitrator resolved the issue, concluding that the CBA did not prohibit HollyFrontier from replacing Lab Testers with Chemists.

The arbitrator then determined—without a request from either party—that "the parties need[ed] to have discussion to determine whether or not the Chemist position is to be within the bargaining unit or outside the bargaining unit." *Id.* at 133. After post-arbitration meetings between HollyFrontier and the Union failed, and under HollyFrontier's protest, the parties returned to arbitration on the issue of whether Chemists were members of the bargaining unit. In November 2022, after briefing

4

and argument on this new issue, the arbitrator determined that the bargaining unit represented by the Union must include Chemists.

HollyFrontier petitioned to the district court to vacate the arbitration award, arguing the arbitrator exceeded his authority by deciding a question the parties did not submit for resolution. The district court agreed, reasoning that the arbitrator's "sole authority was to render a decision as to the interpretation and/or the application of the *challenged provision(s)* of the [CBA]." App'x Vol. II at 391 (quotation omitted). The court noted that the Union itself had framed the issue as "whether [HollyFrontier] violated the CBA when they replaced bargaining unit employees with salaried personnel to perform laboratory work." *Id.* at 392 (quotation omitted). And because this was the "sole issue" submitted for arbitration, the district court concluded the arbitrator had no authority to decide whether Chemists were members of the bargaining unit. *Id.*

The Union timely appealed.

## II.

We review de novo a district court's order to vacate or enforce an arbitration award. *Dish Network L.L.C. v. Ray*, 900 F.3d 1240, 1243 (10th Cir. 2018) (citation omitted). In doing so, we give "great deference" to the arbitrator's determinations. *Id.* This limited scope of review is important because arbitration is a creature of contract: Parties who agree to arbitrate their disputes have chosen to bypass the normal litigation process. And if parties cannot reasonably rely on the arbitrator's

decision, that benefit is lost. *See Foster v. Turley*, 808 F.2d 38, 42 (10th Cir. 1986) (citations omitted).

At the same time, proper deference to the arbitrator's decision does not mean abdication of the judicial role. Federal law requires us to be vigilant in ensuring arbitrators do not "exceed[] their powers." 9 U.S.C. § 10(a)(4). For this reason, our standard of "great deference" applies only to an arbitrator's resolution of "disputes that the parties agreed to submit to arbitration." *Dish Network L.L.C.*, 900 F.3d at 1243; *see United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 ("A party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). It follows that our "first task" in reviewing an arbitrator's award "is to determine whether the parties agreed to arbitrate [the relevant] dispute." *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). Where the parties have limited an arbitrator's authority, we owe no deference to any award that extends beyond those limitations. *See id.*

Parties may limit an arbitrator's authority in either of two ways: They may (1) "submit[] a precise statement of the issues to the arbitrator" or (2) "provid[e] express limitations [on the arbitrator's power] in the collective bargaining agreement." *United Food & Com. Workers, Loc. Union No. 7R v. Safeway Stores, Inc.*, 889 F.2d 940, 946 (10th Cir. 1989) (citation omitted). When the text of the parties' submission is clear, the arbitrator is limited to resolving those issues— regardless of whether the collective bargaining agreement may otherwise permit arbitration of another issue. *See id.* at 946–47 (concluding that courts may look to

the terms of the collective bargaining agreement only when "the question of the submission to the arbitrator is vague." (quotation omitted)); *Retail Store Emps. Union Local 782 v. Sav-On Groceries*, 508 F.2d 500, 502–03 (10th Cir. 1975) (holding that an arbitration award was null and void where the parties did not submit the issue for arbitration); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598 (1960) (upholding an arbitrator's award because the arbitrator did not "abuse[] the trust the parties confided in him," "stayed within the areas marked out for his consideration," and did not go "beyond the submission" of the parties).

The Union readily acknowledges this standard. It does not dispute that the arbitrator was foreclosed from determining whether Chemists were members of the bargaining unit if the parties "submitt[ed] a *precise statement of the issues* to the arbitrator." Reply Br. at 5–6 (quoting *Safeway Stores*, 889 F.2d at 947). But the Union contends that "the parties did not agree to a precise statement of the issues" because "each party framed the issue differently in their post-hearing arbitration briefs." *Id.* at 6. We disagree. Any distinctions in the parties' statements of the issues for arbitration are without a difference. And in the context of the parties' dispute, neither party's statements can reasonably be construed to include the issue of whether Chemists were members of the bargaining unit.

Under the directive of longstanding precedent, we begin our analysis with the text of the parties' submissions. *Safeway Stores*, 889 F.2d 946–47. In its initial briefing before the arbitrator, the Union presented the issue as whether HollyFrontier "violate[d] the [CBA] when they replaced bargaining unit employees with salaried

7

personal [sic] to preform [sic] laboratory work." App'x Vol. I at 93. The Union's central argument was that HollyFrontier "replaced the [b]argaining [u]nit jobs with salaried employees" without giving "notice to the Union." *Id.* at 94. This grievance alone motivated the Union's request that the arbitrator require HollyFrontier to "cease and desist from using salaried employees in the lab[,] [r]eturn the work back to the bargaining unit, reinstate the pervious [sic] lab personal [sic] and make the Union whole in all ways." *Id.* at 98.

HollyFrontier—defending its reassignment of work from hourly workers to salaried Chemists—framed the issue similarly: It wanted the arbitrator to determine whether HollyFrontier had violated the CBA "by determining the work, methods, processes, assignment of work, work duties, the qualifications of the employees and the staffing requirements" for the Facility. *Id.* at 190. As additional defenses, HollyFrontier also contended that the issue was not subject to arbitration and that the Union's grievance was not timely filed.

The parties' framing of the issue shows two sides of the same coin. Both understood that the Union believed HollyFrontier had reassigned work in a manner that violated the CBA. Even the arbitrator recognized his assignment: He acknowledged that, aside from HollyFrontier's contentions that the grievance was not timely or arbitrable, the "primary issue to be determined in this case is whether or not [HollyFrontier] violated the [CBA] when it created the Chemist position." App'x Vol. II at 334. And "based on the entire evidentiary record and the applicable provisions of the [CBA]," the arbitrator determined that "HollyFrontier [did] not

8

violate[] any provisions of the [CBA] when it established the Chemist position." *Id.* at 335.

The arbitrator's analysis should have ended there. As made clear by the parties' briefs and the arbitrator's initial award, the parties agreed to submit only one substantive issue to the arbitrator.[1] That issue did not require the arbitrator to determine whether Chemists were members of the bargaining unit. Though the parties did not use identical wording in their briefing, each submitted precisely the same issue for arbitration. To be sure, each party framed its statement of issues to advocate for its own position. But the parties cabined the issue to the reassignment of work from hourly workers (Lab Testers) to salaried employees (Chemists). And in

---

[1] The Union argues that, because it alleged a violation of a broad section of the CBA in its grievance, the grievance necessarily encompassed any other issues related to that section—including membership in the bargaining unit. *See* Aplt. Br. at 13–17 ("Rightfully stated, the issue is whether [HollyFrontier] violated Article 1, Section 1.01 when it assigned Laboratory work to employees it did not consider to be bargaining unit employees and refused to bargain with the Union over their terms and conditions of employment."). But in its opening brief at arbitration, the Union made no effort to bargain with HollyFrontier over the terms and conditions of the Chemists' employment; rather, it sought to get rid of the Chemists and reinstate the Lab Testers. The Union's mere reference to Article 1, Section 1.01 of the CBA did not grant the arbitrator unfettered authority to resolve all issues related to that section. Nor do the Union's "broad, catch-all prayers for relief" extend the arbitrator's authority beyond the parties' clear submission. Dissent at 32; *see, e.g.*, App'x Vol. II at 284 (asking the arbitrator to stop HollyFrontier from using Chemists in the lab and to "make the Union whole in all ways."); *id.* at 289 (asking the arbitrator to determine whether HollyFrontier violated the CBA by replacing bargaining unit employees with Chemists and, if so, "what shall the remedy be?"). As the Union readily acknowledges, it "did not explicitly request that the Chemists be placed in the bargaining unit," and the arbitrator's decision was one that "[n]either party desired." Aplt. Br. at 13 n.1.

9

so doing, the parties limited the arbitrator's authority to resolving that issue alone.[2]

*See* App'x Vol. II at 242 (documenting the CBA's instruction that "[t]he sole authority of the arbitrator is to render a decision as to the interpretation and/or application of *the challenged provision(s)* of [the CBA.]" (emphasis added)).

The dissent in this case insists we should defer to the arbitrator's broad interpretation of the scope of the issues submitted by the parties.  Dissent at 11–13. For support, it cites this Court's decision in *Burlington Northern and Sante Fe Railroad Company v. Public Service Company of Oklahoma*, in which we affirmed a district court's application of a "deferential standard of review to the [arbitration] board's determination of the scope of its authority."  636 F.3d 562, 569 (10th Cir. 2010).  The dissent also cites numerous out-of-circuit cases, claiming they reached similar conclusions.  *See, e.g.*, *El Dorado Tech. Servs., Inc. v. Union Gen. De Trabajadores de Puerto Rico*, 961 F.2d 317, 321 (1st Cir. 1992); *Metromedia Energy, Inc. v. Enserch Energy Servs., Inc.*, 409 F.3d 574, 579 (3d Cir. 2005); *Richmond, Fredericksburg & Potomac R.R. Co. v. Transp. Commc'ns Int'l Union*, 973 F.2d 276,

---

[2] The Union's self-contradicting claims reinforce this conclusion.  In its post-hearing briefing, the Union asked the arbitrator to determine whether HollyFrontier violated the CBA when it assigned laboratory work to employees who were *not* bargaining unit employees (i.e., Chemists)—individuals who, in the Union's mind, had improperly taken away work from employees who *were* members of the bargaining unit (i.e., Lab Testers).  This undercuts the Union's argument that it submitted for arbitration the question of whether Chemists were members of the bargaining unit.  Aplt. Br. at 14; Reply Br. at 8; Dissent at 22.  Neither party alleged that Chemists were, are, or should be members of the bargaining unit; in context, any statements arguably referencing the accretion issue were made to advance the Union's contention that Union workers could perform the same work as Chemists. *See, e.g.*, App'x Vol. II at 394–95.

280 (4th Cir. 1992); *Waverly Min. Prods. Co. v. United Steelworkers of Am.*, 633 F.2d 682, 685 (5th Cir. 1980); *Lattimer-Stevens Co. v. United Steelworkers of Am.*, 913 F.2d 1166, 1170 (6th Cir. 1990); *Pack Concrete, Inc. v. Cunningham*, 866 F.2d 283, 285 (9th Cir. 1989); *Int'l Bhd. of Elec. Workers, Loc. Union 824 v. Verizon Fla., LLC*, 803 F.3d 1241, 1247 (11th Cir. 2015); *Madison Hotel v. Hotel & Rest. Emps., Loc. 25*, 144 F.3d 855, 857 (D.C. Cir. 1998); *Nat'l Football League Players Ass'n ex rel. Peterson v. Nat'l Football League*, 831 F.3d 985, 997 (8th Cir. 2016).

Each of these cases is either inapposite, distinguishable, or less deferential to the arbitrator's authority than the dissent claims. For example, in *Burlington*—the only binding authority cited by the dissent for its proposition—we addressed an arbitrator's resolution of a pricing dispute between the Burlington Northern and Santa Fe Railway Company (BNSF) and the Public Service Company of Oklahoma (PSO). 636 F.3d at 564. BNSF claimed the arbitration board had exceeded its authority by deciding "an independent, non-arbitrable issue" relating to the existence of a "floor rate" in a coal transportation agreement. *Id.* at 568. But after reviewing the parties' arbitration submission agreement, the Court upheld the award because the board's finding was "directly related" to the issues included in that agreement. *Id.* at 567. Put differently, the Court concluded that because BNSF had "submitted the precise issue for arbitration," it could no longer contend that issue was outside the board's scope of authority. *Id.* Here, by contrast, neither party raised the secondary issue decided by the arbitrator—that is, whether Chemists should be included in the bargaining unit. *See supra* at 7–10. And because "the parties [never] agreed to

11

arbitrate [that] issue," we need not defer to the arbitrator's decision.[3] *Burlington*, 636 F.3d at 568; *see* App'x Vol. II at 242 (limiting the arbitrator's authority to "the interpretation and/or application of *the challenged provision(s)* of [the CBA.]" (emphasis added)).

The dissent's claim that our decision today will "creat[e] a circuit split" ignores the plethora of authorities supporting—and in some cases, requiring— thorough judicial review of an arbitrator's interpretation of the scope of the issues submitted. *See, e.g.*, *Matteson v. Ryder Sys. Inc.*, 99 F.3d 108, 113–15 (3d Cir. 1996) (reversing an arbitrator's decision "[b]ecause the [arbitral tribunal] exceeded its authority as arbitrator by deciding issues not submitted to it by the [parties]"); *id.* at 114 ("It is the parties, not the arbitrator, who decide the issues submitted"); *John Morrell & Co. v. Local Union 304A of the United Food & Commercial Workers*, 913

---

[3] The dissent's remaining, out-of-circuit citations similarly do not require blind deference to the arbitrator's determinations of the scope of its authority when the parties' submissions are clear. *See, e.g.*, *El Dorado*, 961 F.2d at 320–21 (affirming an arbitration award because "the scope of the instant controversy, as framed by the question jointly submitted to the arbitrator by the parties . . . was broad enough to permit consideration" of the entire agreement); *Metromedia*, 409 F.3d at 579 (affirming an arbitration award but acknowledging that "courts are neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions of arbitrators" and concluding that "our review must focus upon the record as a whole in determining whether the arbitrators manifestly exceeded their authority in interpreting the scope of the parties' submissions." (quotation omitted)); *Richmond*, 973 F.2d at 280 (concluding that, when parties submit a "broad issue" to an arbitrator, deference is required "so long as it is *rationally derived from the parties' submission*." (emphasis added)); *Int'l Broth. Of Elec. Workers*, 803 F.3d at 1247 (noting that an arbitrator is "not free to reinterpret the parties' dispute and frame it in his own terms."); *Nat'l Football League Players Ass'n*, 831 F.3d at 997 (upholding an arbitrator's award because, among other things, one of the parties "framed the issue . . . broadly.").

F.2d 544, 559–61 (8th Cir. 1990) (affirming the district court's determination that an arbitral decision was beyond the scope of the issues submitted because "the arbitrator was not 'even arguably . . . acting within the scope of his authority'" (quotation omitted)); *Bowater Carolina Co. v. Rock Hill Local Union No.1924*, 871 F.2d 23, 26 (4th Cir. 1989) (directing the district court to vacate an arbitrator's decision on an issue not submitted by parties because enforcing such "basic rules of decisionmaking" helps arbitration "retain its viability as a most useful tool in dispute resolution"); *Courier-Citizen Co. v. Boston Electrotypers Union No. 11*, 702 F.2d 273, 280–81 (1st Cir. 1983) (vacating a district court's order enforcing a back pay award to an employee not mentioned in the parties' submission); *Lattimer-Stevens*, 913 F.2d at 1171 (Boggs, J., dissenting) (noting that "[r]eview of arbitration decisions is one of the more difficult and standardless enterprises facing an appellate judge" and arguing that "there must be . . . some line beyond which an arbitration decision will not be upheld."); *Madison Hotel*, 114 F.3d at 861 (Henderson, J., concurring in the judgment) ("[T]he scope of an arbitrator's authority is limited to those subjects the parties intend *to submit to arbitration* . . . If an arbitrator oversteps the authority delegated by the parties, it is the duty of the reviewing court to rein him in.").

All of this demonstrates that our deferential standard of review does not apply to cases where, as here, the parties' submission of the issues for arbitration is clear. But perhaps most fatal to the dissent's position is its failure to meaningfully distinguish the cases that actually bind us on this issue. In *Sav-On Groceries*, this

13

Court reviewed an arbitrator's award of back pay to a store clerk that one party claimed went beyond the lone issue submitted for arbitration. 508 F.2d at 503. The parties in that case asked the arbitrator to determine whether "the company exercise[d] fairness in judging" an employee's qualifications "by not allowing her to displace less senior employees who engage[d] in stocking and checking duties." *Id.* at 501. This "narrow" submission, we concluded, was not "in any sense 'vague,'" thus limiting the arbitrator's authority to resolve any broader questions. *Id.* at 503 (quotation omitted). And because the arbitrator failed to "stay[] within the areas marked out for his consideration," we affirmed the district court's vacatur of the arbitrator's award of back pay to the employee. *Id.* at 503; *see Safeway Stores*, 889 F.2d at 950 (concluding that parties may limit the arbitrator's discretion and authority by "submitting a precise statement of the issues" for arbitration).

In our view, that is exactly what happened in this case. The Union asked the arbitrator to determine whether HollyFrontier "violate[d] the [CBA] when they replaced bargaining unit employees with salaried personal [sic] to preform [sic] laboratory work." App'x Vol. I at 93. This submission is narrow, *see supra* at 7–10, and "[i]t strains credibility to suggest that in context this submission is vague." *Safeway Stores*, 889 F.2d at 950 (McKay, J., concurring in part and dissenting in part). The arbitrator resolved that issue completely before turning to a second, unrelated, and unsubmitted issue: "whether or not the Chemist position is to be within the bargaining unit or outside the bargaining unit." App'x Vol. I at 133. Because the arbitrator failed to "stay[] within the areas marked out for his

14

consideration," our precedents required the district court to vacate the arbitrator's decision on that issue. *Sav-On Groceries*, 508 F.2d at 503.

\* \* \*

At all stages of arbitration, the Union alleged only that salaried Chemists were impermissible replacements for hourly Lab Testers. Any references made to other provisions of the CBA in the Union's post-hearing briefs were made only to argue that Union members could perform the work of a Chemist. *See supra* at 10 n.2. That the Union asked the arbitrator to determine whether HollyFrontier violated the CBA when it assigned laboratory work to employees who were *not* bargaining unit employees (i.e., Chemists)—individuals who, in the Union's mind, had improperly taken away work from employees who *were* members of the bargaining unit (i.e., Lab Testers)—reinforces this conclusion.

HollyFrontier's framing of the issue does nothing to expand the Union's original allegation. And because the parties' submission of the issue was clear, we owe no deference to the arbitrator's interpretation of the scope of the issues presented for arbitration. *Sav-on Groceries*, 508 F.2d at 502–03; *Safeway Stores*, 889 F.2d at 946–47. The district court thus acted within its authority to review and vacate the arbitrator's decision regarding the unsubmitted issue of whether Chemists should be included in the bargaining unit.

### III.

For these reasons, we AFFIRM the district court's vacatur of the arbitration award.

15

23-8046, *HollyFrontier Cheyenne Refin. LLC v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union Loc. 11-574.*
**PHILLIPS, J.**, dissenting.

I would reverse the district court and reinstate the arbitration award because we owe the same high level of deference to an arbitrator's view of the *scope* of the issues submitted in arbitration as is accorded the merits of an arbitrator's decision. Because the majority departs from the well-reasoned weight of authority on this issue, I respectfully dissent.

After setting out some background, I clarify the appropriate standard of review and then apply it to this case.

## I.    Factual and Procedural Background

For decades, HollyFrontier (or the Company) and the Union enjoyed a symbiotic and beneficial relationship, which was memorialized in their collective bargaining agreement (CBA) and renewed every three years. The CBA at issue in this case was effective from March 1, 2019, through March 1, 2022. Relevant here, the CBA included a "recognition" clause in Article 1, Section 1.01: "The Company recognizes the Union as exclusive bargaining agent of all Operating, Process, Laboratory, Warehouse, and Maintenance . . . employees, for the purpose of collective bargaining with respect to wages, hours and working conditions." App. vol. II, at 231.

The CBA also included a detailed, multi-step grievance procedure in Article 16, "to provide a method for final determination of questions or

disputes involving the interpretation and/or application of the provisions of this Agreement." *Id.* at 240. After going through the first four steps in the grievance procedure (which include verbal grievances, written grievances, and conferences), if the grievance is still not resolved, "then the parties may refer the matter to either mediation or arbitration." *Id.* at 241. If both parties "agree that mediation would be beneficial, they may agree to refer the grievance to either binding or non-binding mediation." *Id.* But one party may unilaterally submit the matter to arbitration. *See id.* ("Either party may request the grievance be submitted to binding arbitration."). In that case, the parties must select an arbitrator from a list of arbitrators recommended by the Federal Mediatory Conciliation Service.

At some point in 2020, the parties' relationship soured when HollyFrontier decided for "business and environmental reasons" to "repurpose[] the Cheyenne Refinery to a renewable diesel facility ('RDU')," which meant that the refinery would "produc[e] diesel fuel from vegetable oil." *Id.* at 373–74. According to the testimony of an operations employee, eighty employees were permanently laid off in June 2020, and another forty employees in February 2021. In the spring of 2021, jobs were posted for a new "Chemist" position, and new lab equipment arrived in the summer of that year. *Id.* at 318.

In February 2021, "the Company and the Union agreed to a Memorandum of Understanding [(MOU)] that modified the CBA but carried forward all of its

other terms." *Id.* at 374. The MOU stipulated that the Company would "assign operations and warehouse employees to a 'new classification' within the Renewable Diesel facility." *Id.* at 284. After an effective date of March 29, 2021, "all future operations and warehouse vacancies will be considered non-biddable and filled by Company selection." *Id.* But the MOU did not cover *laboratory* employees, leaving the Union as the exclusive bargaining representative of those employees under the recognition clause in Section 1.01 of the CBA.

## A.    The Union's Grievance

The Union filed a grievance on September 14, 2021, triggering the first steps in Article 16's grievance process. The grievance letter stated that the Union "believe[d] that the use of supervision/salaried employees to perform the duties of Lab Testers is disregarding several articles of the [CBA]," *id.* at 286, listed the CBA provisions it believed were being disregarded (including Section 1.01, the recognition clause), and "request[ed] that the company cease and desist from violating the [CBA] and that incidents be rectified," *id.* at 287. The grievance was not resolved orally or in writing and so the parties agreed to submit the grievance to arbitration.

## B.    First Round of Arbitration & April Award

An arbitration hearing was held on March 8, 2022, before arbitrator William J. Miller. There is no transcript of this hearing in the record, and so the discussions are unknown to us. But we do know that "[i]n lieu of oral closing

3

arguments, the parties decided to file post hearing briefs." *Id.* at 316.

HollyFrontier submitted its post-hearing brief on March 18, 2022, and the

Union submitted its brief on March 25, 2022. The arbitrator issued his first

decision on April 25, 2022 (April Award).

The arbitrator framed the issue as, "did the Company violate the

Agreement when it created the Chemist position?" *Id.* at 332. Weighing both

sides of the issue, the arbitrator concluded that "the Company has not violated

any of the provisions of the Agreement when it established the Chemist

position," but he also concluded that "the recognition clause found in Article 1

provides that 'the Company recognizes the Union as the exclusive bargaining

agent of all . . . laboratory . . . employees for the purpose of collective

bargaining . . . [,]'" and "is not eliminated by Article 4 of the Agreement,"

which governs management functions. *Id.* at 335. And so the arbitrator

determined that, "because the laboratory work continues to be performed, . . .

the parties need to have discussion to determine whether or not the Chemist

position is to be within the bargaining unit or outside the bargaining unit." *Id.*

In the formal "award" section, the arbitrator wrote:

> Related to the recognition issue, the parties are directed to meet for
> the purpose of determining whether the individuals hired for the
> Chemist position are part of the bargaining unit or are to be
> considered outside of the bargaining unit. If this issue is not resolved
> by agreement of the parties, I will retain jurisdiction of this matter
> and will make the final decision in this regard, after considering the
> respective arguments of the parties.

*Id.* at 336.

4

C.    **Second Round of Arbitration & November Award**

The parties were unable to resolve the recognition issue themselves, and so the arbitrator held a second hearing on August 17, 2022. The parties submitted another round of post-hearing briefs, after which the arbitrator issued his second decision on November 5, 2022. *Id.* at 356 (November Award). His award centered around the question "whether or not the Chemist position is in or outside the bargaining unit." *Id.* at 367. He concluded that, under the recognition clause in the CBA, as a contractual matter, "the Chemists are to be included in the bargaining unit." *Id.* at 369. He then "retain[ed] jurisdiction to resolve any issues that may arise during the implementation of this Award." *Id.*

D.    **District Court Proceedings**

HollyFrontier petitioned in federal district court to vacate the November Award under 9 U.S.C. § 10(a) and 29 U.S.C. § 185. The Union answered the petition and counterclaimed for confirmation of the award. The district court ruled on three issues, vacating the award on the first issue: It ruled that the arbitrator (1) "exceeded his authority by raising and deciding an issue that the parties never agreed to arbitrate," but also held that the arbitrator (2) "did not manifestly disregard National Labor Relations Board ('NLRB') province or standards," and (3) "did [not] violate the Chemists' Section 7 right." *HollyFrontier Cheyenne Refin. LLC v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union Loc. 11-574*, No. 22-CV-254, 2023 WL 4500055, at *1 (D. Wyo. June 28, 2023).

5

## II.    Standard of Review

I discuss the appropriate standard of review in three sections: First, this case does not present a question of arbitrability and so de novo review of the arbitrator's decision is inappropriate. Second, our review of the merits of an arbitral award is highly deferential. Third, our review of the arbitrator's interpretation of the scope of the issues submitted to him should be equally deferential.

### A.    HollyFrontier does not raise a question of arbitrability.

The district court framed the dispute—whether "the parties agree to arbitrate *this* question?"—as an "arbitrability question." *HollyFrontier*, 2023 WL 4500055, at *5. This framing is incorrect. Questions of arbitrability arise when the parties dispute whether a particular grievance can be submitted to arbitration in the first place. *See Dish Network L.L.C. v. Ray*, 900 F.3d 1240, 1243–44 (10th Cir. 2018) ("The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the *question of arbitrability*, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." (cleaned up)); *see also Brent Elec. Co. v. Int'l Bhd. of Elec. Workers Loc. Union No. 584* (*Brent Electric*), 110 F.4th 1196, 1218 n.13 (10th Cir. 2024) ("[T]he [Supreme] Court . . . uses the 'clear and unmistakable' waiver standard to determine whether parties have agreed to submit the 'gateway' issue of arbitrability to an arbitrator . . . ." (citing *Dish Network*, 900 F.3d at 1243–44)). So "where the challenged arbitral decision involves a

6

question of arbitrability, a court reviews the arbitrator's decision de novo. Questions of arbitrability typically relate to the subject matter of a dispute and whether the parties agreed to settle a particular type of dispute through arbitration or in court." *Goldgroup Res., Inc. v. DynaResource de Mexico, S.A. de C.V.*, 994 F.3d 1181, 1190 (10th Cir. 2021)).

But the dispute here is the *scope* of the issues submitted to the arbitrator, based on the parties' submissions, not whether the issues were properly before him—this type of dispute has a different (and far more deferential) standard of review than a question of arbitrability. *See Madison Hotel v. Hotel & Rest. Emps., Loc. 25*, 144 F.3d 855, 857 n.1 (D.C. Cir. 1998) ("This question—the scope of the submission to the arbitrator—should not be confused with the question of arbitrability—whether the employer and the union agreed in the [CBA] to put a particular issue to arbitration. The latter question is reviewed by a federal court *de novo*. The former, as we have just indicated, is not." (citations omitted)).

Perhaps led astray by HollyFrontier's briefing below, the district court erroneously treated this as an arbitrability question and applied the clear-and-unmistakable-evidence standard to this case. *See HollyFrontier*, 2023 WL 4500055, at *5 ("The first [issue] is [reviewed] *de novo* due to the arbitrability question at bar . . . ."); *id.* at *9 ("I cannot see 'clear and unmistakable evidence that the parties intended to delegate [the] [accretion] question to an arbitrator.'" (quoting *Dish Network*, 900 F.3d at 1245)); App. vol. I, at 25

7

("Questions of arbitrability . . . are reviewed *de novo*." (citing *Goldgroup Resources*, 994 F.3d at 1190)). Despite HollyFrontier's efforts to frame the dispute as an arbitrability issue, the record below flatly contradicts this because HollyFrontier conceded that the dispute was properly before the arbitrator. *See* App. vol. II, at 295 ("The parties agreed the matter was properly before the Arbitrator for determination of all issues.").[1] And it is telling that HollyFrontier disputes only the *remedy* that the arbitrator awarded—that is, it complains that the remedy exceeded the scope of the issues the parties presented. HollyFrontier does not argue that the *issues* themselves should not have been presented to the arbitrator, nor is it challenging the arbitrator's determination

---

[1] The only issue of arbitrability raised by the Company and dismissed by the arbitrator was whether "the matter [was] arbitral under the MOU as assignments of work are not subject to arbitration." App. vol. II, at 321. The Arbitrator rejected the Company's argument that the MOU precluded the Union from arbitrating the dispute:

> In my considered opinion, this language, which states that assignments will not be subject to arbitration clearly refers to the assignments made to operations and warehouse employees. There is no reference made in this situation to lab employees, and the contention of the Company that this grievance is not subject to arbitration is not persuasive. Consequently, it is my determination this grievance is arbitrable, notwithstanding the provisions of the applicable MOU.

*Id.* at 333–34. But HollyFrontier did not challenge this determination before the district court nor attempt to argue plain error on appeal, so it has waived this question-of-arbitrability argument. *See Ball v. United States*, 967 F.3d 1072, 1078 (10th Cir. 2020) ("Because Plaintiffs failed to preserve their argument below and have not argued for relief under plain-error review, we consider the argument waived.").

of his own authority to decide this dispute. Indeed, "[a]n arbitrability issue does not arise whenever the losing party to an arbitration avers the arbitrator exceeded his or her authority." *Burlington N. & Santa Fe Ry. Co. v. Pub. Serv. Co. of Okla.*, 636 F.3d 562, 569 (10th Cir. 2010). But that is what happened here.

So I would reject HollyFrontier's efforts to frame this as an arbitrability issue and decline to review the arbitrator's decision de novo; in my view, the district court erred by doing so.

**B.    Our review of the merits of an arbitral award is deferential.**

In reviewing de novo "a district court's order to vacate or enforce an arbitration award" "we give great deference to an arbitrator's decision." *Dish Network*, 900 F.3d at 1243 (cleaned up). In this context, "[o]ur powers of review have been described as among the narrowest known to the law." *Id.* (cleaned up); *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) ("[C]ourts . . . have no business weighing the merits of the grievance . . . or determining whether there is particular language in the written instrument which will support the claim." (quoting *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960))). So "arbitral decisions" are typically "insulat[ed] . . . from judicial review." *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 37 (1987). This highly deferential standard applies because "[t]he federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards."

9

*Id.* at 36. In practice, this standard means that an arbitral award is legitimate if it "draws its essence from the [CBA]" and if "the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *Loc. No. 7, United Food & Com. Workers Int'l Union v. King Soopers, Inc.*, 222 F.3d 1223, 1227 (10th Cir. 2000) (first quoting *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.* (*Enterprise Wheel*), 363 U.S. 593, 597 (1960); and then quoting *Misco*, 484 U.S. at 38).

The district court correctly applied this deferential standard to its review of two of the three issues presented to it, concluding that the arbitrator did not "manifestly disregard accretion law in determining, based on Art. 1, § 1.01's plain language, that the Chemists were part of the bargaining unit," *HollyFrontier*, 2023 WL 4500055, at *10, nor did the arbitrator "contraven[e] the Chemists' [NLRA] Section 7 right to refrain from union membership," *id.* at *11. But the district court did not apply the same deferential standard to its review of the arbitrator's interpretation of the scope of the issues presented. I examine that standard next.

## C.    Our review of the arbitrator's interpretation of the scope of the issues should be equally deferential.

In *Burlington Northern*, we affirmed the district court's application of "a deferential standard of review to the [arbitration] board's determination of the *scope* of its authority." 636 F.3d at 569 (emphasis added); *see id.* at 568 ("[O]nce a court independently determines the parties agreed to arbitrate an

issue, it should give 'extreme deference' to an arbitrator's decision regarding the scope of that issue."). Similarly, most of our sister circuits have long applied the same level of deference to an arbitrator's interpretation of the scope of the issues submitted to him as is accorded the merits of his decision and his interpretation of the CBA itself. *See, e.g.*, *El Dorado Tech. Servs., Inc. v. Union Gen. De Trabajadores de Puerto Rico*, 961 F.2d 317, 321 (1st Cir. 1992) ("An arbitrator's view of the scope of the issue committed to his care is entitled to the same far-reaching respect and deference as is normally accorded to the arbitrator's interpretation of the [CBA] itself."); *Metromedia Energy, Inc. v. Enserch Energy Servs., Inc.*, 409 F.3d 574, 579 (3d Cir. 2005) ("[T]he appropriate standard for our review of the arbitrator's interpretation of the scope of a submission . . . is highly deferential." (cleaned up)); *Richmond, Fredericksburg & Potomac R.R. Co. v. Transp. Commc'ns Int'l Union*, 973 F.2d 276, 280 (4th Cir. 1992) ("The arbitrator's interpretation of the scope of the issue submitted is entitled to deference, and must be upheld so long as it is rationally derived from the parties' submission." (citation omitted)); *Waverly Min. Prods. Co. v. United Steelworkers of Am.*, 633 F.2d 682, 685 (5th Cir. 1980) ("We think it was for the arbitrator to decide just what the issue was that was submitted to it and argued by the parties."); *Lattimer-Stevens Co. v. United Steelworkers of Am.*, 913 F.2d 1166, 1170 (6th Cir. 1990) ("[T]he extraordinary deference given to an arbitrator's ultimate decision on the merits applies equally to an arbitrator's decision that the parties have indeed submitted a

11

particular issue for arbitration." (citation omitted)); *Pack Concrete, Inc. v. Cunningham*, 866 F.2d 283, 285 (9th Cir. 1989) ("In our view, deference to an arbitrator's interpretation of a submission follows from the Supreme Court's directive that 'when the subject matter of a dispute is arbitrable, procedural questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator.'" (quoting *Misco*, 484 U.S. at 40)); *Int'l Bhd. of Elec. Workers, Loc. Union 824 v. Verizon Fla., LLC*, 803 F.3d 1241, 1247 (11th Cir. 2015) ("[W]here . . . the parties refuse to stipulate to the issues at arbitration, the arbitrator is 'empowered' to frame and decide all the issues in the grievance *as he sees them*," and "it was ultimately for the arbitrator to decide what issues were put before him." (citation omitted)); *Madison Hotel*, 144 F.3d at 857 ("An arbitrator's view of the issues submitted to him for arbitration therefore receives the same judicial deference as an arbitrator's interpretation of a [CBA]."); *see also Nat'l Football League Players Ass'n ex rel. Peterson v. Nat'l Football League*, 831 F.3d 985, 997 (8th Cir. 2016) ("The Players Association's framing of the issue assumed a premise that was contested by the League . . . . The arbitrator was not required to accept the Association's disputed premise; he properly asserted authority to resolve whether the premise was correct.").

I agree with the Ninth Circuit "that the same policies which have led this court to defer to an arbitrator's interpretation of a [CBA] weigh strongly in favor of deferring to an arbitrator's interpretation of the contours of the issues

12

submitted." *Pack Concrete*, 866 F.2d at 286. And I agree with the Third Circuit's four reasons for doing so: "First, plenary judicial review of arbitration submissions undermines the congressional policy in favor of expeditious and relatively inexpensive means of settling grievances, and thus of promoting labor peace." *Mobil Oil Corp. v. Indep. Oil Workers Union*, 679 F.2d 299, 302 (3d Cir. 1982). "Second, a failure to defer to the arbitrator's interpretation of the submission would in some cases be inconsistent with deference to the arbitrator's interpretation of the agreement." *Id.* Third, "interpretation of the submission will likely involve consideration of the same issues as a review of the merits." *Id.* And fourth, "a deferential standard obviates the burden that would rest upon the judiciary if it were required to determine, case by case, the exact scope of submission in the endless number of grievances and disputes that inevitably occur between employers and employees." *Id.*

We ignore *Burlington Northern* and the weight of authority on this issue at our peril. Instead of departing from our precedent and creating a circuit split on this issue, I would build on our previous application of this deferential standard here. I turn next to the application of this standard to the issues in this case.

## III.  Application to this Case

The district court erred by categorizing this dispute as an "arbitrability question," and thus by applying de novo review. *HollyFrontier*, 2023 WL 4500055, at *5. It narrowly framed the parties' issue as an "accretion issue"

13

(rather than a recognition-clause issue) before determining that the parties did not agree to submit "accretion" to arbitration. *Id.* at *7 ("Was Arbitrator Miller authorized to reach the accretion issue? I find that he was not. . . . I focus on whether the parties agreed to arbitrate accretion in the leadup to the first award."). Because accretion was central to the district court's framing of the issue, I briefly review what that term means.

The National Labor Relations Act (NLRA) gives employees the right "to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. The NLRA empowers the NLRB to "decide in each case whether . . . the unit is appropriate for the purposes of collective bargaining." § 159(b). The NLRB (and reviewing courts) determine whether the composition of a bargaining unit is appropriate under two frameworks: accretion and severance. *Burke v. Utah Transit Auth. & Loc. 382*, 462 F.3d 1253, 1260 (10th Cir. 2006). Relevant here, accretion "occurs when new employees, or present employees in new jobs, perceived to share a sufficient community of interest with existing unit employees, are added to an existing bargaining unit without being afforded an opportunity to vote in a union election."[2] *Id.* at 1261 (citation omitted). This

---

[2] By contrast, severance occurs when "changes in job structure are so significant that the existing bargaining unit, including the affected employees, is no longer appropriate." *Burke*, 462 F.3d at 1261 (citation omitted). Severance is seen as "the converse of accretion" because "a group of employees either wishes to split off from the larger group in an existing bargaining unit or the employer claims that a group of employees should be excluded from a bargaining unit due to technological or organizational change." *Id.*

14

happens "most frequently when an employer acquires a new facility, and attempts to add the new employees at this facility, without an election, to a preexisting bargaining unit." *Id.*

"[I]t is well-established that accretion is a matter involving the application of statutory policy and standards—a matter within the particular province of the [NLRB]." *Penske Truck Leasing Co. & Int'l Bhd. of Teamsters, Loc. No. 957*, 371 N.L.R.B. No. 113, at *1 (July 12, 2022) (citation omitted); *see also Burke*, 462 F.3d at 1260 n.2 (noting that accretion and severance are "procedural tools used by the [NLRB] to judge whether a bargaining unit satisfies the standards set forth in NLRA"). But where "an agreement allows arbitration of contractual disputes that may affect representational issues," these disputes "are within the *concurrent*, not exclusive jurisdiction of the NLRB." *Commc'n Workers of Am. v. US W. Direct*, 847 F.2d 1475, 1478 (10th Cir. 1988) (quoting *Int'l Union, U.A.W. v. Telex Comput. Prods.*, 816 F.2d 519, 525 (10th Cir. 1987)). In such cases, "the concurrent jurisdiction of the NLRB will not deprive the parties of their bargain," and so an arbitrator may decide those types of disputes. *Id.* (quoting *Telex*, 816 F.2d at 525).

With that backdrop, I return to this case. First, the presumption of arbitrability applies here because there is an arbitration clause in the CBA and because HollyFrontier offers no evidence to show that it intended to exclude accretion, recognition, or representation issues from Article 16 when it signed the CBA in March 2019. Second, applying an appropriately deferential standard

15

of review to the arbitral award and to the arbitrator's interpretation of the submissions presented him, the arbitrator did not exceed his authority, because the arbitral award drew its essence from the CBA.

## A.    The presumption of arbitrability applies here.

The Union argues that the presumption of arbitrability applies in this case. I agree. Where a "contract contains an arbitration clause, there is a presumption of arbitrability." *AT&T*, 475 U.S. at 650. This means that, if the parties have a written agreement to arbitrate, then we assume that a particular dispute is arbitrable "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Id.* (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582–83 (1960)). The presumption applies where "arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed and . . . is legally enforceable and best construed to encompass the dispute." *Brent Electric*, 110 F.4th at 1211–12, (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 303 (2010)). So, "[i]n the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad." *Warrior & Gulf*, 363 U.S. at 584–85; *accord United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv.*

16

*Workers Int'l Union Loc. 13-857 v. Phillips 66 Co.*, 839 F.3d 1198, 1204 (10th Cir. 2016).

Our circuit's three-part inquiry tracks the same standard the Court set out in *Warrior & Gulf* to determine "whether a particular dispute falls within the scope of an agreement's arbitration clause." *Burlington Northern*, 636 F.3d at 569. "First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow." *Id.* (quoting *Cummings v. FedEx Ground Package Sys., Inc.*, 404 F.3d 1258, 1261 (10th Cir. 2005)). At the second step, "if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." *Id.* (quoting same). "[W]here the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview." *Id.* (quoting same). But, if "the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *Id.* (quoting same).

Here, the CBA contains an agreement to arbitrate disputes, and so there is a presumption of arbitrability. *See AT&T*, 475 U.S. at 650. Article 16 of the CBA includes a clear procedure for grievances, which culminates in an agreement to arbitrate any unresolved issues, should one party unilaterally

17

invoke arbitration. The CBA explains that the "purpose of the Grievance Procedure is to provide a method for final determination of questions or disputes involving the interpretation and/or application of the provisions of this Agreement." App. vol. II, at 240. The CBA defines a "grievance" as "an allegation by an employee or the Union that the Company has violated, during the term of this Agreement, an express provision of this Agreement." *Id.* Included in Article 16 is the challenged-provisions clause which provides that "[t]he arbitrator . . . shall have no authority to add to, delete or modify any of the terms or provisions of this Agreement. The sole authority of the arbitrator is to render a decision as to the interpretation and/or application of the challenged provision(s) of this written contract." *Id.* at 242.

Because arbitration may be invoked by either party to resolve any grievance that "the Company has violated, during the term of this Agreement, an express provision of this Agreement," *id.* at 240, I would classify Article 16 as a "broad" arbitration clause, *Burlington Northern*, 636 F.3d at 569 (citation omitted); *see also Warrior & Gulf*, 363 U.S. at 585. Nowhere in the record did the Company challenge the grievance procedure itself, nor the validity of the arbitration clause in Article 16. And HollyFrontier does not point us to any evidence, "forceful" or otherwise, indicating its intent in March 2019 to exclude accretion or representation issues from its Article 16 agreement to

18

arbitrate.[3] *See Warrior & Gulf*, 363 U.S. at 585. So under *Burlington Northern*'s framework, because "the arbitration clause is broad," the "presumption of arbitrability" applies. 636 F.3d at 569 (citation omitted).

We therefore look at the details of this dispute with the presumption that it is arbitrable, and we look through a highly deferential lens.

**B.    The arbitrator acted within the scope of his authority as provided in the CBA and submissions.**

Viewed under *Burlington Northern*'s framework and with the appropriate level of deference to the arbitrator's interpretation of the scope of submissions, I conclude that the arbitration award was well within the scope of the arbitrator's authority and that this is not one of the "extraordinary circumstances" where vacatur of an arbitral award is justified under 9 U.S.C. § 10(a)(4). *Dodson Int'l Parts, Inc. v. Williams Int'l Co.*, 12 F.4th 1212, 1228 (10th Cir. 2021) (citation omitted). To determine the scope of the arbitrator's authority, we "look both to the contract and to the submission." *United Food &*

---

[3] HollyFrontier's "real-time objections" to the April Award are not evidence that HollyFrontier intended to exclude accretion issues from Article 16's arbitration clause when it agreed to the CBA in March 2019, and so those objections do nothing to defeat the presumption of arbitrability that arises from that arbitration clause. *See Brent Electric*, 110 F.4th at 1218 ("Other than Brent's real-time objections to the Union's unilateral submission of the dispute to [the arbitrator] in the spring of 2021, Brent offers no evidence to refute its intent in the spring of 2018 to submit '[u]nresolved issues or disputes arising out of the failure to negotiate a renewal or modification of this agreement' to arbitration, as memorialized in the 2018 CBA. . . . Without such evidence, . . . the presumption of arbitrability would still apply." (quoting record)).

*Com. Workers, Loc. Union No. 7R v. Safeway Stores, Inc.*, 889 F.2d 940, 946 (10th Cir. 1989) (citation omitted).

The arbitrator was acting according to the authority given him by the parties in Article 16 of the CBA, the validity of which HollyFrontier does not challenge. As discussed above, Article 16 in the CBA is a broad arbitration clause that gives the arbitrator authority to reach disputes arising from violations of the CBA. Though it is true that parties "*may* limit the discretion of the arbitrator, such as through submitting a precise statement of the issues to the arbitrator or through providing express limitations" in the CBA, "[w]hen the parties fail to limit the scope of the submission, . . . we will affirm the arbitrator's award if it draws its essence from the [CBA] and is not contrary to the express language of that agreement." *Id.* at 947 (emphasis added). "If the parties enter into a submission agreement, this later contract is the substitute for legal pleadings; it joins the issues between the parties and empowers the arbitrator to decide it." *Id.* at 946 (quoting *Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators Warehouse Indep. Truck Drivers Union, Loc. No. 1*, 611 F.2d 580, 584 (5th Cir. 1980)).

Here, there is no narrowing of the arbitrator's authority in the CBA (other than by the challenged-provisions clause), and the parties did not enter into a submission agreement. In my view, the district court confused this rule and reversed the standard that should apply by reasoning that "absent is any indication that the parties 'agree[d] to *extend* the arbitrator's authority in the[ir]

20

submissions.'" *HollyFrontier*, 2023 WL 4500055, at *8 (emphasis added) (quoting *Safeway Stores*, 889 F.2d at 946). Contrary to the district court's analysis, the parties did not *need* to "extend the arbitrator's authority" for the Union to challenge the recognition clause or for the arbitrator to decide the accretion or representation issues submitted to him; rather, under the arbitration agreement in the CBA, which was broad, and under the presumption of arbitrability that applies here, they would have had to *narrow* his authority by agreement to exclude accretion, recognition, or representation issues from arbitration.

With no explicit narrowing of the arbitrator's authority, I next examine the scope of that authority, as delineated by the parties' submissions, and I examine whether the relief requested by the parties determines that scope.

### 1. The Union's submissions brought the recognition clause before the arbitrator.

According to HollyFrontier, "the Recognition Clause is the only provision in the CBA governing Unit membership." Resp. Br. at 27. And so whether it was properly raised in the parties' submissions governs whether the arbitrator had authority to reach accretion, recognition, or representation in his award.

First, the Union's grievance letter invoked the recognition clause, Article 1, Section 1.01, by listing it first after this introduction:

21

We believe that the use of supervision/salaried employees to perform the duties of Lab Testers is disregarding several articles of the Collective Bargaining Agreement.

1. Article 1, Section 1.01

The Company recognizes the Union as exclusive bargaining agent of all Operating, Process, Laboratory, warehouse, and Maintenance (except as provided in Section 1.02) employees for the purpose of collective bargaining with respect to wages, hours and working conditions.

. . . .

The union requests that the company cease and desist from violating the collective bargaining agreement and that incidents be rectified.

App. vol. II, at 286–87 (quoting CBA).

By listing the recognition clause in its grievance letter, the Union challenged the recognition clause, thereby bringing it under the scope of the challenged-provisions clause, and thus the arbitrator's authority. *See id.* at 242 (authorizing the arbitrator "to render a decision as to the interpretation and/or application of the challenged provision(s) of this written contract"). In this way, the Union explicitly contested that the "[t]he Company [was not] recogniz[ing] the Union as exclusive bargaining agent of all . . . Laboratory . . . employees." *Id.* at 286–87 (quoting CBA).

Second, the Union raised the recognition clause again in its first post-hearing brief, listing it first under the heading, "Relevant Contract Provisions." *Id.* at 289. The brief's issue statement asked, "Did the Company violate the agreement when they replaced bargaining unit employees with salaried personal

22

[sic] to preform [sic] laboratory work? If so, what shall the remedy be?" *Id.* In various ways, the Union argued that the Company violated the recognition clause. *See, e.g., id.* at 290 ("The Company replaced the Bargaining Unit jobs with salaried employees. . . . The Union has shown that the work is covered in the [CBA]."); *id.* at 292 ("[W]e can still perform that work and we are the legal representatives of the lab in 'Article 1 Section 1.01.'"). In addition to asking for the return of the Lab Testers and Technicians to the Laboratory, it also asserted that the CBA covered the Laboratory workers, no matter who was working there: "[T]he Laboratory work regardless who is needed are covered by the [CBA]." *Id.* at 293; *see also id.* ("[T]he work of the Laboratory Tester or Technicians is covered under the agreement."). The Union also argued that, because the Company brought in the Chemists, this was "insourcing" and not "out sourcing" workers and so "the Union has rights to represent those workers." *Id.* at 292. And to make its point very clear, it summarized that, "At the end of the day if a Chemist is needed they would still be covered under the CBA. If the Company wanted the laboratory taken out of the contract they could have done so at negotiations, they did not." *Id.* at 293.

Applying a deferential standard of review to the arbitrator's interpretation of the scope of the issues submitted, the arbitrator did not err by interpreting the Union's grievance and briefs to challenge HollyFrontier's violation of the recognition clause. Those submissions were also sufficient to challenge HollyFrontier's violation of the Union's contractual right to represent

23

Laboratory workers. As the district court observed in affirming the *merits* of the arbitral award, "Arbitrator Miller based his decision upon Art. 1, § 1.01 – perhaps the bedrock 'agreement' between Petitioner and Respondent and recently endorsed by the NLRB as one vehicle to accretion." *HollyFrontier*, 2023 WL 4500055, at *10; *see id.* at *11 (concluding that the arbitrator "had concurrent jurisdiction over accretion and a proper contractual basis for his decision under the CBA's recognition clause"). So the award "dr[e]w its essence from the CBA" because it was not "contrary to the express language of the contract" nor was it "unfounded in reason and fact," or "so unconnected with the working and purpose of the agreement as to manifest an infidelity to the obligation of the arbitrator." *King Soopers*, 222 F.3d at 1227 (quoting *Mistletoe Express Serv. v. Motor Expressmen's Union*, 566 F.2d 692, 694 (10th Cir. 1977)).

The district court's de novo inquiry into the scope of the issues submitted to the arbitrator narrowly focused on "whether the parties agreed to arbitrate accretion in the leadup to the first award." *Id.* at *7. It asked whether "the CBA's recognition clause, Art. 1, § 1.01, [was] challenged." *Id.* But instead of taking the Union's grievance letter and subsequent submissions at face value, as did the arbitrator, the district court justified ignoring the Union's citations to the recognition clause in both the grievance letter and post-hearing brief by speculating that "the Union cited the recognition clause in its grievance merely to 'show[] that the [Chemists'] work is covered' by the CBA's terms." *Id.* at *8

24

(quoting record). The district court reasoned that, though the Union "thrice alluded to Art. 1, § 1.01, in its post-hearing brief," it never did so "to allege a violation; instead, it did so to argue that unit members could perform Chemist work." *Id.* The district court therefore interpreted the parties' submissions as an agreement "to arbitrate work allocation," but not representation. *Id.*; *see id.* (stating that only the issue whether the Company "could create the Chemist position" was "grieved, argued, and briefed before Arbitrator Miller prior to his April [Award]").[4]

HollyFrontier argues on appeal that "[t]o allege a violation, the Union needed to allege a defect in the composition of the Unit—i.e., that certain members needed to be added or taken out. The Grievance contains no such allegations and the facts presented clearly demonstrate the Union never intended to include the Chemists in the bargaining unit." Resp. Br. at 21. True, the grievance letter listed several articles but did not assert specific violations of each one. Rather, each article was prefaced with the same introduction: "the use of supervision/salaried employees to perform the duties of Lab Testers is disregarding several articles of the [CBA]." App. vol. II, at 286. But as the Union replies, this argument cannot hold water because, "[i]f the grievance is read as not alleging a violation of Article 1, Section 1.01 . . . then it must be

---

[4] The district court listed only two provisions as being challenged: Article 6.02 (requiring notice to the union of hiring decisions), and Article 13.02 (mandating salaried staff cannot perform Union work). *HollyFrontier*, 2023 WL 4500055, at *8.

25

read as not alleging *any* violation of the CBA," and HollyFrontier does not question the district court's determination of other issues similarly challenged that were decided favorably to HollyFrontier. Reply Br. at 8 (emphasis added). We must examine the post-hearing briefs, too, to understand the gist of the Union's grievance.

The Union also pushes back on the district court's "characteriz[ation of] the issue as being one of accretion rather than violation of Article 1, Section 1.01," Op. Br. at 16 n.2, and critiques the court's determination that "Arbitrator Miller injected accretion into a work allocation dispute" "*sua sponte*," *HollyFrontier*, 2023 WL 4500055, at *9. As the Union contends, "[t]he issue of whether the Company violated Article 1, Section 1.01 by not including Chemists in the bargaining unit was raised by the Union's grievance, not the Arbitrator." Op. Br. at 16 n.2.

But even if the district court was correct to frame the dispute as an accretion issue, and even if accretion was a "collateral matter" not central to the parties' dispute or requested relief, *Burlington Northern*, 636 F.3d at 569, I would still affirm the arbitrator's decision because, as the district court determined, the arbitrator "had concurrent jurisdiction over accretion and a proper contractual basis for his decision under the CBA's recognition clause," *HollyFrontier*, 2023 WL 4500055, at *11. In other words, the award "dr[ew] its essence from the [CBA]," *Enterprise Wheel*, 363 U.S. at 597, and was "not

26

contrary to the express language of that agreement," *Safeway Stores*, 889 F.2d at 947.

To support its conclusion that the recognition clause was not on the table, the district court leaned on HollyFrontier's Article 4 right to "determine the manpower, staffing and qualifications for [RDU] employees." *HollyFrontier*, 2023 WL 4500055, at *8 (citation omitted). Naturally, in its post-hearing brief, HollyFrontier framed the dispute as a management-rights issue: "Did the Company violate the provisions of the [CBA] by determining the work, methods, processes, assignment of work, work duties, the qualification of the employees and the staffing requirements for the renewable diesel facility?" App. vol. II, at 295. Accordingly, it emphasized that the pertinent CBA provisions were in Article 4, which describes management functions.[5] *See id.* at 296–98 (quoting CBA § 4.01(A), (C), (E), (H), (I), (K)). HollyFrontier also cited Article 24, § 24.08 of the CBA: "When filling vacancies in non-biddable positions, in plant qualified employees will be given preference before going out of the plant. If there are not any qualified employees in plant, the Company may hire from out of the plant." *Id.* at 299. It argued that there is "clear,

---

[5] The Company also challenged whether the Union's grievance was timely under Article 16, and whether work assignments were arbitrable under the MOU. The arbitrator concluded that the grievance was "not untimely," and that the MOU was irrelevant to "Laboratory" employee assignments because it discussed assignments made only to "operations and warehouse employees." App. vol. II, at 333. HollyFrontier did not challenge these determinations before the district court or on appeal.

unequivocal and unambiguous CBA language supporting [the Company's] decision to determine the manpower, staffing and qualifications for employees working [at the refinery]." *Id.* at 313.

But an arbitrator should not rely on only the company's articulation of the issues, because *of course* a company would want to frame the issue as beneficially as it could to promote its own interests. A company's attempt to cabin a dispute to the clauses most favorable to the company does not—or should not—mean that such maneuverings could *limit* the issue's scope, and thus an arbitrator's authority. If that was the law, then it would always be the case that an astute company lawyer could frame the issue to give the arbitrator authority to decide an issue only the company's way. *Cf. Nat'l Football League*, 831 F.3d at 997 ("The Players Association's framing of the issue assumed a premise that was contested by the League . . . . The arbitrator was not required to accept the Association's disputed premise; he properly asserted authority to resolve whether the premise was correct.").

The district court did not explain how it was such a great leap for the arbitrator to take the Union's grievance that the Chemists are covered by the CBA because, per the recognition clause, the Union represents all employees in the Laboratory, and fashion a remedy that effectively "added [the Chemists] to [that] existing bargaining unit." *Burke*, 462 F.3d at 1261; *see HollyFrontier*, 2023 WL 4500055, at *8. The arbitrator was doing his best to reconcile two truths: on the one hand, "the Company has not violated any of the provisions of

28

the Agreement when it established the Chemist position," but on the other, "the recognition clause found in Article 1 provides that 'the Company recognizes the Union as the exclusive bargaining agent of all . . . laboratory . . . employees for the purpose of collective bargaining,'" and "is not eliminated by Article 4 of the Agreement." App. vol. II, at 335. As the Union summarizes it, the arbitrator found that "the Company had the power to establish higher qualifications for the work previously done by Lab Testers but did not have the power to assign that work outside the bargaining unit." Op. Br. at 13 n.1.

The Union should not be faulted for failing to precisely articulate the contractual conundrum these unique circumstances presented, nor for failing to propose a workable solution, particularly where, as is "[c]ustomarily" the case, one party (here, the Union) "may not be represented by counsel," and arbitration is "informal." *Piggly Wiggly*, 611 F.2d at 583. The informality pervading most arbitration proceedings in the labor context is part of the reason why we should not pick over the parties' submissions as if they were legal pleadings but defer to the arbitrator's interpretation of those submissions. *See, e.g.*, *Richmond, Fredericksburg & Potomac R.R.*, 973 F.2d at 280 ("The arbitrator's interpretation of the scope of the issue submitted is entitled to deference, and must be upheld so long as it is rationally derived from the parties' submission." (citation omitted)); *Mobil Oil Corp*, 679 F.2d at 302 (disapproving on policy grounds "plenary judicial review of arbitration submissions"). This is also why, "[w]here the question of the submission to the

29

arbitrator is vague, the award of the arbitrator will not be set aside in a subsequent proceeding, unless it can be shown that the essence of the resulting award was not drawn from the [CBA]." *Safeway Stores*, 889 F.2d at 946 (citation omitted).

The district court's dueling determinations on arbitrability and merits are illustrative of the Third Circuit's concern that "a failure to defer to the arbitrator's interpretation of the submission" is "inconsistent with deference to the arbitrator's interpretation of the agreement." *Mobil Oil Corp.*, 679 F.2d at 302. *Compare HollyFrontier*, 2023 WL 4500055, at *11 (concluding that the arbitrator "had concurrent jurisdiction over accretion and a proper contractual basis for his decision under the CBA's recognition clause"), *with id.* at *7 (concluding that the issue of accretion was not submitted to the arbitrator). This contradiction also illustrates the problems that arise with an unequal standard of review of the same issues. *See Mobile Oil Corp.*, 679 F.2d at 302 ("[I]nterpretation of the submission will likely involve consideration of the same issues as a review of the merits.").

Here, for example, in deciding the *merits* of the arbitrator's resolution of the "accretion issue," the district court pointed to various places in the record where the Union raised the dispute under the recognition clause. *HollyFrontier*, 2023 WL 4500055, at *10 (affirming the arbitrator's accretion determination and quoting Union submissions for statements such as "the matter at issue is a contractual issue which needs to be resolved in accordance with Article [1],

30

Section 1.01" and "[t]he work performed by the Chemists continues to be Laboratory work, and within the scope of the Union's exclusive jurisdiction within the Laboratory, per Art. 1, § 1.01" (citation omitted)). Yet the district court dismissed the Union's same invocations of the recognition clause in its arbitrability-question analysis. *See id.* at *8 ("The Union's grievance, though mentioning Art. 1, § 1.01, concerned work allocation," and "Respondent thrice alluded to Art. 1, § 1.01, in its post-hearing brief, but never to allege a violation."). This inconsistent treatment epitomizes the Third Circuit's concern with applying a different level of deference to the arbitrator's view of the parties' submissions than is applied to the merits.

And I see no defect in the arbitrator's decision in the April Award to direct the parties to confer about whether the Chemists "are part of the bargaining unit." App. vol. II, at 336. I disagree with the district court's speculation that the arbitrator's "hesitancy" in ruling on the recognition clause in April "insinuate[d] his then-unfamiliarity" with it or implied a "*sua sponte* injection*" of that issue into the dispute. *HollyFrontier*, 2023 WL 4500055, at *8 n.21. Having decided that "the subject matter of a dispute is arbitrable," that the Union raised the recognition clause as a challenged provision, and that the arbitrator had authority to decide the issue, "'procedural' questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator." *Misco*, 484 U.S. at 40.

31

In my view, under the deferential standard of review that *Burlington Northern* and the weight of caselaw requires, the arbitrator did not exceed his authority by concluding that the Chemists, because they performed work in the Laboratory, were added to the bargaining unit under the CBA's terms as a "contractual" matter. *HollyFrontier*, 2023 WL 4500055, at *11. And because the Union challenged the recognition clause and argued that the Chemists were covered by the CBA, the arbitrator did not exceed his authority by reaching that issue.

### 2.    The relief requested does not determine the scope of the issues submitted.

One final point. In coming to its conclusion about the scope of the arbitrator's authority, the district court also erred in its analysis of the *relief* the Union requested: "Consider, also, the requested relief by the aggrieved. The Union regurgitated homogeneous 'cease and desist' language – in its grievance, initial post-hearing brief, and second post-hearing brief – to cement its desired relief from Arbitrator Miller." *HollyFrontier*, 2023 WL 4500055, at *8. But the Union also requested *broad* relief at various points in the proceedings: in its grievance letter it asked "that the company cease and desist from violating the [CBA] and *that incidents be rectified.*" App. vol. II, at 287 (emphasis added). In its post-hearing brief, it asked, "Did the Company violate the agreement when they replaced bargaining unit employees with salaried personal [sic] to preform [sic] laboratory work? If so, *what shall the remedy be*?" *Id.* at 289

32

(emphasis added). And in closing, it asked "that [the arbitrator] sustain the grievance and that the Company cease and desist from using salaried employees in the lab. Return the work back to the bargaining unit, reinstate the pervious [sic] lab personal [sic] and *make the Union whole in all ways*." *Id.* at 294 (emphasis added).

The district court ascribed to the Union one simple goal: "The Union simply wanted its Lab Testers/Technicians back in the laboratory. If Respondent wanted an accretion order, why did it not ask for it?" *HollyFrontier*, 2023 WL 4500055, at *8. But any specific relief that the Union requested should not work to constrict the arbitrator's authority to fashion a suitable remedy, particularly when the Union also voiced broad, catch-all prayers for relief. *See Enterprise Wheel*, 363 U.S. at 597 ("When an arbitrator is commissioned to interpret and apply the [CBA], he is to bring his informed judgment to bear in order to reach a fair solution of a problem. *This is especially true when it comes to formulating remedies*." (emphasis added)). The Union conceded in its appellate brief that it "did not explicitly request that the Chemists be placed in the bargaining unit," nor was it the "outcome either party desired," but, all the same, the Union argued that "the Company had no authority to give Laboratory work to non-unit employees, however classified," and it defended the remedy the arbitrator awarded as "within his power to interpret and enforce the CBA." Op. Br. at 13 n.1.

33

In my view, the specific relief that the parties request (or do *not* request) is not dispositive of the scope of the issues submitted, and thus the arbitrator's authority. It would be a rare dispute in which both parties request the same relief, or even symmetrical-but-opposing forms of relief (such as accretion versus severance). Just as the district court questioned why the Union did not ask for an accretion order, *HollyFrontier*, 2023 WL 4500055, at *8, the Union also questioned why the Company did not ask for the "laboratory [to be] taken out of the contract," App. vol. II, at 293. Not all disputes fit into a precise binary framework, and sometimes arbitrators impose Solomonic compromises that neither party requests. For this reason the Court recognized over sixty years ago that, in crafting remedies, arbitrators need "flexibility in meeting a wide variety of situations," and that "[t]he draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency." *Enterprise Wheel*, 363 U.S. at 597.

HollyFrontier reiterates on appeal that, though "arbitrators do have broad remedial discretion, this discretion is limited to the issues presented by the parties." Resp. Br. at 29. HollyFrontier argues that an arbitrator must still "stay[] within the areas *marked out for his consideration*." *Id.* (quoting *Retail Store Emp. Union Loc. 782 v. Sav-On Groceries*, 508 F.2d 500, 503 (10th Cir. 1975)). HollyFrontier cites *Sav-On Groceries* for the proposition that an arbitrator may not award relief that was not requested by the parties. *See id.* In that case, we affirmed the district court's vacatur of an arbitration award

34

because the arbitrator awarded back pay to a store clerk, when the issue submitted to the arbitrator was very narrow and did not request that relief: "Did the company exercise fairness in judging the qualifications of Donna Whiles by not allowing her to displace less senior employees who engage in stocking and checking duties." *Sav-On Groceries*, 508 F.2d at 501; *see id.* at 503. In justifying our affirmance, we reasoned that, not only was the submission of the issue "narrow," it was also not "in any sense vague." *Id.* at 502–03 (cleaned up).

Unlike the parties' narrow and specific submission in *Sav-On Groceries*, the parties' submissions here are much more wide-ranging and include broad and even "vague" requests for relief. *See id.* at 503. So *Sav-On Groceries* is distinguishable.

To determine the scope of the issues raised, and to determine appropriate relief, the arbitrator must exercise his own judgment, not simply defer to that of one party or the other. *See Verizon*, 803 F.3d at 1247 ("[I]t was ultimately for the arbitrator to decide what issues were put before him, and his decision must be affirmed if he was 'even arguably' acting within the scope of his power."); *Nat'l Football League*, 831 F.3d at 997.

The arbitrator must be able to discern and address the underlying substantive issues in any dispute, even though they may be disguised by the parties' mislabeling the dispute or packaging it in their favor. *See Pack Concrete*, 866 F.2d at 285 ("Application of this rule [deferring to an

35

arbitrator's interpretation of a submission] is especially apt in the instant case, where [the company's] argument is not that the discharge issue was not arbitrable or even factually unrelated to the dispute, but rather that the Union mislabeled the issue when it requested the panel.").

The arbitrator properly exercised his own judgment to fashion an appropriate remedy based on the issues submitted to him. Applying the same level of deference to the arbitrator's determination of the scope of issues submitted to him as is accorded to his interpretation of the CBA itself, I would reverse the district court and reinstate the arbitral award.

* * *

For these reasons, I respectfully dissent.